In re Review of PROPOSED TOWN
OF NEW SHOREHAM
PROJECT.

No. 2010–273–M.P.

Supreme Court of Rhode Island.

July 1, 2011.

Michael R. McElroy, Esq., Providence, for Petitioners, Toray Plastics (America), Inc. and Polytop Corporation.

Gerald J. Petros, Esq., Providence, for Respondents, The Narragansett Electric Company d/b/a National Grid and Deepwater Wind Block Island, LLC.

John A. MacFadyen, Esq., Providence, for Respondents, Governor Lincoln D. Chafee, Rhode Island Senate President M. Teresa Paiva–Weed and Rhode Island Speaker of the House of Representatives Gordon D. Fox.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice INDEGLIA, for the Court.

Before this Court, pursuant to a statutory petition for a writ of certiorari, G.L. 1956 § 39–5–1, are Toray Plastics (America), Inc. (Toray) and Polytop Corporation (Polytop), collectively the petitioners. The petitioners seek our review of a decision by the Rhode Island Public Utilities Commission (the commission) approving an amended power-purchase agreement (PPA) between Narragansett Electric

Company d/b/a National Grid (National Grid) and Deepwater Wind Block Island, LLC (Deepwater Wind), collectively the respondents. Per this amended PPA (2010 PPA), Deepwater Wind agreed to construct a small-scale, offshore wind farm in state waters near Block Island and then sell the electricity generated by the wind farm to National Grid, a statewide power distributor. National Grid, in turn, pledged to purchase the generated electricity and apportion the entire cost of building the multimillion-dollar wind farm to in-state ratepayers over the course of the twenty-year contract. Motivated by dissatisfaction with National Grid's above-market cost-distribution plan, the petitioners challenge the commission's assessment that the 2010 PPA met all statutory preconditions for approval.

Toray and Polytop first make the overarching argument that the commission's decision is flawed inherently because, rather than conducting an independent review of the 2010 PPA, the commission allegedly applied a deferential review standard excessively weighted in favor of approval. Their particular quarrels include the commission's indifference to the 2010 PPA's lack of mandatory provisions for constructing and allocating the costs of a transmission cable between Block Island and the mainland of the state; and the commission's findings that the 2010 PPA is commercially reasonable, provides economic-development benefits and environmental benefits, and establishes a proper mechanism to distribute savings realized in the cost of construction, if any, to ratepayers.

After thoroughly examining the record and carefully considering the parties' written submissions[1] and oral arguments, we

affirm the commission's decision to approve the 2010 PPA.

## I

### Facts and Procedural History

Before immersing ourselves in the controversy involving National Grid, Deepwater Wind, Toray, and Polytop, this Court first will provide some background information outlining the responsibilities of the commission and introducing Rhode Island's renewable energy legislation. Then, we will recount the rising action that led to petitioners' instant legal challenges. Comprising the first act, this Court will describe the 2009 PPA negotiated between Deepwater Wind and National Grid, National Grid's request for the commission's approval of the 2009 PPA, and the commission's subsequent rejection based on its assessment that the 2009 PPA was not "commercially reasonable." Continuing on to the second act, we next will present the General Assembly's response to the commission's rejection, the resulting amendment to the controlling statute, National Grid and Deepwater Wind's subsequent modifications to the 2009 PPA that produced the 2010 PPA, and National Grid's attempt at winning the commission's approval of the 2010 PPA.

Lastly, we will describe the courtroom drama that ensued after the commission, applying the controlling statute's newly adopted four-factor test and revision to the definition of "commercially reasonable," approved the 2010 PPA. We shall introduce the actors initially petitioning this Court for a writ of certiorari to challenge the commission's decision: Toray, Polytop, Conservation Law Foundation (CLF), and

---

1. The petitioners' position is supported by the several *amici curiae* that submitted briefs in this case. We thank the Rhode Island Manufacturers Association (RIMA), the Environmental Council of Rhode Island (ECRI), and the Ocean State Policy Research Institute (OSPRI) for their well-reasoned arguments.

the former Rhode Island Attorney General, Patrick C. Lynch. Then, we will revisit the jurisdictional vignette on standing that was precipitated by the renunciation of suit by the current Attorney General, Peter F. Kilmartin. After briefly reviewing the reasons why this Court saw fit to usher CLF from the stage based on a lack of standing, we shall proceed to the legal questions presented by petitioners, the only parties deemed to have standing to be heard in this forum.

## A

### The Commission

Created by G.L.1956 chapter 1 of title 39, the commission is the "quasi-judicial" counterpart to the Division of Public Utilities and Carriers (the division).[2] Section 39–1–3(a); *see also In re Kent County Water Authority Change Rate Schedules*, 996 A.2d 123, 126 (R.I.2010) (explaining that the General Assembly "segregate[d] the judicial and administrative attributes of ratemaking and utilities regulation * * * in the [commission] and the [division]") (quoting *Narragansett Electric Co. v. Harsch*, 117 R.I. 395, 402, 368 A.2d 1194, 1199 (1977)). Together, these two regulatory bodies form a bicameral state agency that endeavors to achieve the public policy goals of § 39–1–1: that public utilities are fairly regulated to ensure that cost-effective energy supplies are available, that the rates charged for energy supplies and services are reasonable, and that evenhanded competition between electric distribution companies is maintained. Section 39–1–1(b). To attain these aims, both entities are given "the exclusive power and authority to supervise, regulate, and make orders

governing the conduct of [electric distribution] companies," but are required to "provid[e] full, fair, and adequate administrative procedures and remedies" as a check to their powers. Section 39–1–1(c); *see also* § 39–1–27.6 (articulating the standards of conduct for electric distribution companies). It is the role of the commission to provide the forum for redress and also to ensure that an avenue for judicial review exists for those aggrieved by its administrative rulings. Section 39–1–3(a); § 39–1–1(c).

As required by statute, the commission is composed of three commissioners or "electors"[3] who are selected based on "their qualifications and experience in law and government, energy matters, economics and finance, engineering and accounting." Section 39–1–4(a). This panel of three "sit[s] as an impartial, independent body, and is charged with the duty of rendering independent decisions affecting the public interest and private rights based upon the law and upon the evidence presented before it." Section 39–1–11. The commission "hold[s] investigations and hearings involving the rates, * * * and the sufficiency and reasonableness of facilities and accommodations of * * * electric distribution." Section 39–1–3(a). Only one commissioner must be present at these hearings to constitute a quorum; however, "the concurrence of a majority of the commission shall be required for the rendering of a decision." Section 39–1–11.

Pertinent to the issues before us, this Court observes that in both 1996 and 2006, the General Assembly expressly augmented the commission and division's stated

---

2. In the simplest of terms, the Division of Public Utilities and Carriers (the division) performs any functions not specifically reserved to the Public Utilities Commission (the commission). G.L.1956 § 39–1–3(b).

3. Each commission elector is "appointed by the governor with the advice and consent of the senate" and serves for six years. Section 39–1–4(a).

purposes under § 39–1–1 to take into account rising energy costs and their correlative effect on a healthy economy. To that end, the Legislature directed the commission's decision-making to embrace several factual findings including:

"[1] [t]hat lower retail electricity rates would promote the state's economy and the health and general welfare of the citizens of Rhode Island[,]" § 39–1–1(d)(1); and

"[2] [t]hat prices of energy, including especially fossil-fuels and electricity, are rising faster than the cost of living and are subject to sharp fluctuations, which conditions create hardships for many households, institutions, organizations, and businesses in the state," § 39–1–1(e)(1); and

"[3] [t]hat the state's economy and the health and general welfare of the people of Rhode Island benefit when energy supplies are reliable and least-cost," § 39–1–1(e)(3); and

"[4] [t]hat it is a necessary move beyond basic utility restructuring in order to secure for Rhode Island, to the maximum extent reasonably feasible, the benefits of reasonable and stable rates, least-cost procurement, and system reliability that includes energy resource diversification * * *." Section 39–1–1(e)(4).

In tandem with directing the commission to focus on "energy resource diversification," reduced reliance on fossil fuels, and ameliorating the detrimental effect of high electricity rates, the General Assembly also took specific legislative steps to steer electric distribution companies toward renewable sources and away from fossil-fuel energy generation. *See, e.g.,* G.L.1956 chapter 26 of title 39; G.L.1956 chapter 26.1 of title 39. The commission was tasked with supervising the electric distribution companies' compliance with these renewable energy development statutes. *See* chapter 26 of title 39; chapter 26.1 of title 39.

### B

### Rhode Island Renewable Energy Legislation[4]

The benefits of renewable energy are well documented. One Rhode Island commentator recently summarized that "[this] country's ever-increasing demand for electricity" and "[d]ependence on foreign countries' fossil fuel resources has contributed to high energy prices, national security issues and environmental risks." Jacqueline S. Rolleri, Comment, *Offshore Wind Energy in the United States: Regulations, Recommendations, and Rhode Island,* 15 Roger Williams U.L.Rev. 217, 217 (2010) (citing Peter J. Schaumberg & Angela F. Colamaria, *Siting Renewable Energy Projects on the Outer Continental Shelf: Spin, Baby, Spin!,* 14 Roger Williams U.L.Rev. 624, 625 (2009)). To avoid these drawbacks of fossil-fuel reliance, Congress and state legislatures have instituted "green" initiatives to promote the development of renewable energy resources in-

---

**4.** This Court notes the existence of the Joint Development Agreement (JDA) between the State of Rhode Island and Deepwater Wind Rhode Island, LLC (Deepwater Wind RI) signed on January 2, 2009. The JDA and the instant 2010 PPA are parallel, but interrelated, endeavors aimed at attaining the renewable-energy goals set by the state's Office of Energy Resources. However, the JDA is a creature of the executive branch, while the 2010 PPA emanates from legislative action. Because our reviewing function concerns itself with the legislative piece, it is not necessary for this Court to explain exhaustively the nuances of the JDA bidding process and the obligations of Deepwater Wind RI and the state pursuant to that agreement. Suffice to say the JDA exists and played some role in spurring the legislation at issue here.

cluding solar radiation, geothermal power, fuel cells, biomass, and wind turbines. *See, e.g.*, 26 U.S.C. § 45 (2011) (establishing a federal tax credit for producing and selling renewable electricity); 26 U.S.C. § 48 (2011) (instituting a federal tax credit for investing in certain renewable energy property); 42 U.S.C. § 16516 (2010 Supp.) (permitting the "Secretary [of Energy to] * * * make [loan] guarantees * * * for [renewable energy] projects that commence construction not later than September 30, 2011"); Mass. Gen. Laws ch. 25, § 20 (2010) (establishing a method to provide "[f]unding for development and promotion of renewable energy projects"). The State of Rhode Island is no exception.

## 1

### Chapter 26 of Title 39

In its first foray into the renewable-energy arena, the General Assembly, in 2004, enacted the "Renewable Energy Standard," codified at chapter 26 of title 39 (RES statute). Briefly, this statute requires "obligated entities [to] obtain at least three percent (3%) of the electricity they sell at retail to Rhode Island end-use customers * * * from eligible renewable energy resources." Section 39–26–4(a). The RES statute directed the 3 percent requirement to begin in 2007 and scheduled a yearly increase in the percentage of renewable-energy sales required thereafter. Section 39–26–4(a)(1)–(4). As an alternative, an "obligated entity" also could meet "its compliance obligations by making [a] * * * payment to the Renewable Energy Development Fund." Section 39–26–4(e). To verify compliance with chapter 26's yearly requirements, § 39–26–

6(a)(4) instructed all electric distribution companies to provide the commission with appropriate data filings.

## 2

### The 2009 Version of Chapter 26.1 of Title 39

Pertaining to the issues here, the General Assembly next instructed electric distribution companies to become more directly involved in the development of new renewable energy sources, effectively compelling the companies to take a step beyond chapter 26's requirement to access already existing sources. Identical House and Senate bills, H 5002A and S 0111A, respectively, easily passed both chambers and were signed into law on June 26, 2009 by then-Governor Donald L. Carcieri as chapter 26.1 of title 39, entitled "Long–Term Contracting Standard for Renewable Energy" (2009 LTC statute). H 5002A, P.L.2009, ch. 51, § 1, p. 239; S 0111A, P.L.2009, ch. 53, § 1, p. 248.[5] Its purposes, articulated by § 39–26.1–1 of the 2009 LTC statute, were to "[1] encourage and facilitate the creation of commercially reasonable long-term contracts between electric distribution companies and developers or sponsors of newly developed renewable energy resources with the goals of stabilizing long-term energy prices, [2] enhanc[e] environmental quality, [3] creat[e] jobs in Rhode Island in the renewable energy sector, and [4] facilitat[e] the financing of renewable energy generation." S 0111A, P.L.2009, ch. 53, § 1, p. 248.

---

5. In the interest of conciseness and because H 5002A, P.L.2009, ch. 51, § 1, p. 239 and S 0111A, P.L.2009, ch. 53, § 1, p. 248 are identical, subsequent citations will refer only to the Senate's version of the bill. Also, because an amended version of this statute was codified in 2010, our opinion will cite to the 2009 session laws as a means of distinguishing our references to the 2009 "Long–Term Contracting for Renewable Energy" statute (2009 LTC statute) from the 2010 revised version.

Per § 39–26.1–3(a), the 2009 LTC statute required "each electric distribution company [starting by July 1, 2010] * * * to annually solicit proposals from renewable energy developers" for building new, renewable energy resources,[6] and it also established the general standard for entering into long-term contracts for "the purchase of capacity, energy and attributes from" these new resources. S 0111A, P.L. 2009, ch. 53, § 1, p. 249. For each electric distribution company, § 39–26.1–2(7) and § 39–26.1–3(b) through (c) of the 2009 LTC statute set the escalating requirements for achieving the "minimum long-term contract capacity" of 90 megawatts (MW). S 0111A, P.L.2009, ch. 53, § 1, pp. 249–50. Then, to make the solicitation and contracting requirements more palatable, the 2009 LTC statute provided incentives to electric distribution companies in the form of § 39–26.1–4's "[f]inancial remuneration." S 0111A, P.L.2009, ch. 53, § 1, p. 251 (entitling electric distribution companies to "annual compensation, equal to * * * (2.75%) of the actual annual payments" as compensation "for accepting the financial obligation of the long-term contracts").

Once an electric distribution company obtained proposed contracts for renewable energy from developers, § 39–26.1–3(b) directed the commission to conduct a review. S 0111A, P.L.2009, ch. 53, § 1, pp. 249–50. Per this section, the commission was instructed to "approve the contract if it determine[d] that: (1) the contract is commercially reasonable; (2) the requirements for the annual solicitation have been met;

and (3) the contract is consistent with the purposes of this chapter." *Id.* at 250. As defined in the 2009 LTC at § 39–26.1–2(1), "[c]ommercially reasonable" referred to "terms and pricing that are reasonably consistent with what an experienced power market analyst would expect to see in transactions involving newly developed renewable energy resources." S 0111A, P.L. 2009, ch. 53, § 1, p. 248. If a "dispute [arose] about whether any terms or pricing are commercially reasonable," the commission was directed to hold evidentiary hearings and then make a final determination. *Id.*

Most relevant to the instant controversy, the 2009 LTC statute introduced a specific long-term contract, the Town of New Shoreham Project, at § 39–26.1–7, and instructed the electric distribution company to solicit proposals for its development. S 0111A, P.L.2009, ch. 53, § 1, p. 252. Describing the venture as a "newly developed energy resources project of ten (10)[MW] or less that includes a proposal to enhance the electric reliability and environmental quality of the Town of New Shoreham [Block Island]," the 2009 LTC established deadlines for solicitations, contract submissions, and the commission's decision. *Id.* Section 39–26.1–7(b) of the 2009 LTC statute expressly stated that "[t]he solicitation shall require that each proposal include provisions for a transmission cable between the Town of New Shoreham and the mainland of the state," but then carved out a stipulation that "[t]he electric distribution company, at its option, may propose to own, operate, or otherwise participate in

---

6. In G.L.1956 § 39–26.1–2(6) of the 2009 LTC statute, the phrase "newly developed renewable energy resources" was defined as sources that "have neither begun operation, nor have the developers of the units implemented investment or lending agreements necessary to finance the construction of the unit * * *." S 0111A, P.L.2009, ch. 53, § 1, p. 249.

"[H]owever, [the statute permits] that any projects using eligible renewable energy resources and located within the state of Rhode Island which obtain project financing on or after January 1, 2009, [still] shall qualify as newly developed renewable energy resources for purposes of the first solicitation under this chapter[.]" *Id.*

such transmission cable project, [but could decline the same,] even if the commission approves such arrangements." S 0111A, P.L.2009, ch. 53, § 1, p. 253. The 2009 LTC statute, in § 39–26.1–7(b) and (c), indicated that the "Town of New Shoreham Project" was the umbrella project over which the contract for the purchase of renewable energy and the "transmission cable project" were integral, but not necessarily simultaneous parts. *See* S 0111A, P.L.2009, ch. 53, § 1, pp. 252, 253. (referring to the separately named "transmission cable project" and distinguishing between participation in the "transmission cable project" and the "Town of New Shoreham project"). Overall, the criterion for the electric distribution company's negotiations with developers and the commission's approval of a long-term contract was achieving "a commercially reasonable" agreement. S 0111A, P.L.2009, ch. 53, § 1, p. 252.

## C

### The 2009 PPA and the Commission's Docket 4111

#### 1

#### The 2009 PPA

National Grid heeded the 2009 LTC statute's request in § 39–26.1–7 and timely solicited developers for proposals to construct the 10 MW renewable-energy, Town of New Shoreham Project. Deepwater Wind was the only developer to submit a proposal to National Grid. After two iterations of filing unsigned contracts,[7] National Grid submitted a finalized PPA to the commission on December 10, 2009 (2009 PPA).[8] The 2009 PPA described the undertaking as the construction of a "wind generating facility to be located in the waters off the coast of Block Island, Rhode Island * * * [that would have] [t]he nameplate capacity of * * * no more than thirty (30) MW" (the wind farm).

#### i

#### Pricing

The 2009 PPA established the bundled price of $235.75/MWh for the wind farm-generated electricity, which translated to an applicable rate of 24.4 cents/kWh for ratepayers, including those electricity users, like petitioners, who obtain their electricity from other suppliers. *See* S 0111A, P.L.2009, ch. 53, § 1, p. 252 (explaining that § 39–26.1–5(f) of the 2009 LTC statute permitted the electric distribution company to "charge[ ] * * * all distribution customers through a uniform fully reconciling annual factor in distribution rates, subject to review and approval of the commission"). Basically, because this rate is tied to the distribution fee, rather

---

7. Based on § 39–26.1–7(a) of the 2009 LTC statute, it was permissible for the electric distribution company to submit to the commission an unsigned, and therefore non-binding, copy of its PPA with the developer to meet the deadline imposed by the statute. S 0111A, P.L.2009, ch. 53, § 1, p. 252. At its discretion, the commission could allow the parties to continue negotiations until a true agreement could be reached. *Id.*

8. This Court notes that in the midst of National Grid and Deepwater Wind's negotiations, the General Assembly passed a technical amendment to § 39–26.1–7(a) on November 9, 2009. H 6458, P.L.2009, ch. 216, § 1, pp. 1060–61; S 1066, P.L.2009, ch. 217, § 1, pp. 1062–63. The legislative revisions extended the deadline for the commission's contract-approval decision to January 31, 2010 and permitted the PPA to "include[ ] up to (but not exceeding) eight (8) wind turbines with aggregate nameplate capacity of no more than thirty (30) megawatts, * * *, even if the actual capacity factor of the project results in the project technically exceed[ing] ten (10) megawatts." H 6458, P.L.2009, ch. 216, § 1, pp. 1060–61; S 1066, P.L.2009, ch. 217, § 1, pp. 1062–63.

than solely to the cost of the electricity, all Rhode Island electricity users, regardless of their electricity supplier, would pay the charge to National Grid. The 2009 PPA also included an escalation provision that would increase the price by 3.5 percent each year starting on January 1, 2013. The total number of escalations and, therefore, the length of the 2009 PPA could be no more than twenty years.

### ii

### Costs

Although the bundled price was provided for within the four corners of the 2009 PPA, the estimated cost [9] to build the wind farm was not specifically articulated.

### iii

### Transmission Cable Provisions

In addition to contracting for the wind farm's construction and bundled pricing, the 2009 PPA, in sections 1 and 8, also anticipated the construction of a transmission cable [10] by Deepwater Wind Block Island Transmission, LLC (Deepwater Transmission) [11] that would connect "the [d]elivery [p]oint [on Block Island] and a point on the mainland of Rhode Island." Although maintaining that there would be separate contracts for the construction, purchase, and ownership of the transmission cable, called the "Transmission Cable Purchase Agreement" (TCPA) and "Transmission Cable Cost Arrangement" (TCCA), the 2009 PPA provided some provisions related to transmission-cable negotiation. Specifically, sections 8.5(a) through (d) of the 2009 PPA outlined how unsuccessful negotiations for the separate TCPA and TCCA contracts could cause the termination the 2009 PPA and therefore, cessation of construction of the wind farm. Section 8.5(e) of the 2009 PPA, seemingly tracking § 39–26.1–7(b) of the 2009 LTC statute, provided an opt-out for National Grid that excused the electric distribution company from any obligations for "own[ing], operat[ing] or otherwise participat[ing] in the Transmission Cable." A reciprocal opt-out provision for Deepwater Wind or Deepwater Transmission was not included in the 2009 PPA.

### 2

### The Commission's Rejection of the 2009 PPA in Docket 4111

Applying the statutory definition of "commercially reasonable," the three-member commission unanimously deter-

---

9. We acknowledge the distinction between "price" and "cost." Price or pricing refers to the amount that National Grid, pursuant to the 2009 PPA, would pay to Deepwater Wind for renewable energy generated by the wind farm and that also would subsidize the cost of construction. *See* S 0111A, P.L.2009, ch. 53, § 1, p. 252 ("[A]ll costs incurred in the * * * implementation of the agreement shall be recovered annually by the electric distribution company in electric distribution rates. * * * [T]he commission need not determine the final cost allocation at the time the commission considers and/or approves the contract between the electric distribution company and the project developer."). National Grid was directed to distribute the price among its ratepayers in the form of rates. *Id.*

10. The 24.4 cents/kWh pricing for the 2009 PPA did not include the cost of the transmission cable.

11. According to the 2009 PPA, Deepwater Wind Block Island Transmission, LLC (Deepwater Transmission) is distinct from Deepwater Wind Block Island, LLC (Deepwater Wind). Deepwater Wind is referred to as the "Seller" in the 2009 PPA, whereas Deepwater Transmission is referred to as "Deepwater Transmission" and is defined simply as "a Delaware limited liability company, and its successors and permitted assigns." The 2009 PPA is not forthcoming with the nature of the relationship, if any, between these two entities.

mined that the 2009 PPA did not pass muster, and therefore it denied its approval in docket 4111 on March 30, 2010.[12] As compared to a pricing projection for "New England wholesale energy markets" ("predominantly based on natural gas"), the commission found that the 24.4 cents/kWh starting rate with a 3.5 percent escalation in price per year would result in ratepayers' paying above market for their electricity for the entire duration of the 2009 PPA.[13] The commission noted that there was varying testimony as to how much above market the payments would be, but it settled on National Grid's estimate of $390 million more, over the course of the twenty-year contract, than what ratepayers would pay for traditionally generated energy.

The commission appreciated that renewable energy technology was in its infancy and large capital expenditures [14] necessarily had to be invested for the first installation of such a project, so the above-market pricing was to be expected. Accordingly, the commission understood that its reviewing role, as directed by statute, was to compare "terms and pricing" of the 2009 PPA "with what an experienced power market analyst would expect to see in transactions involving newly developed renewable energy resources," rather than what would be expected for terms and pricing for energy resources in the wholesale market. (Quoting § 39–26.1–2(1).)

However, the commission declined to limit its comparison of the 2009 PPA only to those "electrical generation units that use 'exclusively an eligible renewable energy resource, and that have neither begun operation, nor have the developers of the units implemented investment or lending agreements necessary to finance the construction of the unit.'" (Quoting § 39–26.1–2(6).) Nor would it limit the comparison only to projects identical to the 2009 PPA in "every facet" including size, location, and benefits to Block Island.

Rather, the commission compared the 2009 PPA's "terms and pricing" to any renewable energy project, "regardless of sizing restrictions, technology, location, or novelty." To carry out this comparison, the commission adopted a "two-pronged analysis" that would: (1) "compare the pricing of the [2009] PPA with other renewable energy projects, generally[,]" and also (2) "compare the [internal rate of return (IRR)] achieved at the [2009] PPA price to those which an experienced power market analyst would expect from other renewable energy projects." As determined by the commission, the 2009 PPA could not satisfy either prong.

The commission first distilled the art of corporate finance into two sentences: "[T]he IRR should be sufficient to attract investors, but not more than is necessary to secure financing. A higher-than-expected IRR would lead to the conclusion

12. The written decision was issued by the commission on April 2, 2010.

13. Although ratepayers would be paying significantly above market for their electricity pursuant to the 2009 PPA, the commission, in docket 4111, found that "[National] Grid stands to receive approximately $25 million in statutorily-authorized 'remuneration' payments just for signing the [2009] PPA [and] * * * is guaranteed by law to recover all of the costs of the PPA power purchases from ratepayers * * * and further ha[d] the right to

collect all of its costs associated with its participation in the [4111] docket if the [2009] PPA was approved."

14. Although not ever referred to within the four corners of the commission's decision in docket 4111 or the 2009 PPA, this Court notes that Deepwater Wind provided data responses to augment docket 4111's record that projected that the "estimate of the capital cost" for construction of the wind farm would equal to $219,311,412 ($219 million, for simplicity).

that ratepayers are providing more of a subsidy than is necessary to allow the [p]roject to be financed." In effect, the commission understood that an excessive IRR would indicate that pricing is higher than what an experienced power-market analyst would expect to see, and, that therefore, the 2009 PPA should not be approved. Just as the above-market payments were assessed at different values, the witnesses for the respective parties disagreed on the correct model for calculating the IRR and what economic assumptions to draw. The commission ultimately credited the division's calculations, noting that its consultant, Richard S. Hahn, was the only witness not representing a party with a "financial stake in the outcome." Adopting the division's IRR model, the commission found that the 2009 PPA's IRR far exceeded the 12 percent to 15 percent "reasonable range." As such, "[b]ased on the evidence, the [c]ommission [found] that the pricing of 24.4 cents per kWh with a 3.5% annual escalator * * * [was] higher than that which an experienced power market analyst would expect to see in transactions involving newly developed renewable energy resources." The commission concluded that the 2009 PPA was not commercially reasonable.

Although ultimately denying approval based on the 2009 PPA's lack of commercial reasonableness, the commission also made other findings that proved to be relevant going forward. In particular, the commission noted that "the [current] definition of commercially reasonable does not incorporate an analysis of economic benefits to the [S]tate of Rhode Island," so it was constrained from looking outside the pricing terms of the 2009 PPA to coax the commercially unreasonable 2009 PPA to a point where it was "worth it" anyway. Moreover, the commission was skeptical that even if it could consider the "economic benefits" to Rhode Island, "the record

[could not] support such a finding that other economic benefits would either render this commercially unreasonable contract reasonable or make the $390 million above market costs 'worth the price.'" It noted that the 2009 PPA "would increase energy costs for governmental entities," in a time when "the [s]tate and its municipalities [already] are facing budget shortfalls." Also, the commission found that with "35 to 50 temporary jobs and only 6 permanent ones," "there [was] not sufficient evidence to show that [the 2009 PPA] w[ould] lead to a cost-effective net increase in Rhode Island jobs." It was not stirred to assume, on rhetoric alone, that Rhode Island would earn invaluable economic capital by being the "first mover * * * in a potentially significant new industry that could attract green business" in the future. Lastly in docket 4111, but as prologue to act two of this controversy, the commission was nonplussed to discover that neither the Economic Development Commission (EDC), nor any other entity, had bothered to quantify the effect of these above-market energy costs on Rhode Island businesses. The commission exclaimed: "It is basic economics to know that the more money a business spends on energy, whether it is renewable or fossil based, and whether it is produced in Rhode Island or elsewhere, the less Rhode Island businesses can spend or invest, and the more likely existing jobs will be lost to pay for these higher costs."

To close docket 4111, the commission filed order 19941 on April 2, 2009 stating that the 2009 PPA was "disapproved."

## D

### The General Assembly's Response to the Commission's Rejection of the 2009 PPA—The 2010 Amendments to Chapter 26.1 of Title 39

Within two months of the commission's written decision and order for docket 4111,

the General Assembly responded with an amended version of chapter 26.1 of title 39 that edited only § 39–26.1–7, the section outlining the Town of New Shoreham Project. H 8083A, P.L.2010, ch. 31, § 1, p. 368; S 2819A, P.L.2010, ch. 32, § 1, p. 374 (revised LTC statute). All other sections remained the same as they were in the 2009 LTC statute. Unlike the LTC statute's inaugural passage in 2009, this 2010 amendment was met with less unanimity in the ranks of the state's House of Representatives and Senate. However, the revised LTC statute ultimately passed both chambers and was signed into law by then-Governor Carcieri on June 15, 2010. S 2819A, P.L.2010, ch. 32, § 1, p. 374.

## 1

### The Revised LTC Statute's Stated Goals and Procedural Instructions for the Amended PPA

In the revisions to the 2009 LTC statute, the General Assembly was not shy about its dogged support for the Town of New Shoreham Project, now referred to as "[t]he demonstration project." Section 39–26.1–7(a). In the very first line of the amended section, § 39–26.1–7(a) explained that "[t]he [G]eneral [A]ssembly finds it is in the public interest for the state to facilitate the construction of a small-scale offshore wind demonstration project off the coast of Block Island, including an undersea transmission cable that interconnects Block Island to the mainland * * *." Its rationale for such strong support was summarized in the four goals it wanted the Town of New Shoreham Project "[t]o effectuate:" (1) put Rhode Island at the economic development forefront "of the emerging offshore wind industry"; (2) promote renewable energy and reduce reliance on "foreign sources of fossil fuels"; (3) decrease environmental and health detriments caused by "traditional fossil fuel

energy sources"; and (4) "provide the Town of New Shoreham with an electrical connection to the mainland." *Id.*

In a seeming effort to expedite the Town of New Shoreham Project, the General Assembly specifically authorized National Grid "to enter into an amended [PPA] with the developer * * * on terms that are consistent with the [2009 PPA] that was filed with the commission * * * in docket 4111." Section 39–26.1–7(a). The Legislature permitted National Grid to make alterations in an amended PPA including: "changing dates and deadlines [from the 2009 PPA]" and supplying "pricing terms of [an amended PPA that] are amended as more fully described in subsection 39–26.1–7(e)." Section 39–26.1–7(a). Related to the pricing term in the amended PPA, the General Assembly was explicit: "[P]ricing can only be lower, and never exceed, the original pricing included in the [2009 PPA] that was reviewed in docket 4111." *Id.* Lastly, the General Assembly permitted the amended PPA to contain alterations "made to take into account" legislative revisions to § 39–26.1–7 "since the filing of the [2009 PPA] in docket 4111." *Id.*

Identical to the procedure in the 2009 LTC statute, National Grid was directed to file the amended PPA with the commission, where a new docket would be opened. Section 39–26.1–7(b). The General Assembly delineated the procedure and deadlines for intervening into the new docket, conducting the evidentiary hearings, and issuing the written decision to accept or reject the amended PPA. *Id.*; § 39–26.1–7(d). In a novel twist, the General Assembly instructed "[t]he developer [to] provide funding for the economic development corporation [EDC] to hire an expert experienced in power markets, renewable energy project financing, and power contracts who shall provide testimony regarding the terms and conditions of the [amended

PPA]." Section 39–26.1–7(b). The developer was precluded from selecting or influencing the expert. *Id.*

## 2

### The Four–Factor Test

Also expressly detailed by the General Assembly were the new four factors that the commission would apply in its review of the amended PPA. Section 39–26.1–7(c) first directed the commission to tailor its review to "tak[e] into account the state's policy intention to facilitate the development of a small offshore wind project in Rhode Island waters, while at the same time interconnecting Block Island to the mainland." Then, § 39–26.1–7(c)(i) through (iv) articulated that the commission "shall approve" the amended PPA if:

(1) its "terms and conditions * * * are commercially reasonable," which phrase was newly defined,[15] "for the purposes of this section," to "mean terms and pricing that are reasonably consistent with what an experienced power market analyst would expect to see for a project of a *similar* size, technology and location, and meeting the policy goals in [§ 39–26.1–7(a) ]," § 39–26.1–7(c)(i); (c) (emphasis added); and

(2) it "contains provisions that provide for a decrease in pricing if savings can be achieved in the actual cost of the project pursuant to subsection 39–26.1–7(e)," § 39–26.1–7(c)(ii); and

(3) it "is likely to provide economic development benefits, including: facilitating new and existing business expansion and the creation of new renewable ener-gy jobs; the further development of Quonset Business Park; and, increasing the training and preparedness of the Rhode Island workforce to support renewable energy projects," § 39–26.1–7(c)(iii); and

(4) it "is likely to provide environmental benefits, including the reduction of carbon emissions," § 39–26.1–7(c)(iv).

The General Assembly directed the EDC expert, retained at the expense of the developer pursuant to § 39–26.1–7(b), to provide "an advisory opinion on the findings of economic benefit" and instructed the commission to give this advisory opinion "substantial deference" in making its own required findings on the issue of economic-development benefits. Section 39–26.1–7(c). Likewise, the revised LTC statute directed the Rhode Island Department of Environmental Management (DEM) to provide "an advisory opinion on the environmental benefits" that the commission also was required to afford "substantial deference" when making its own findings on this factor. *Id.*

## 3

### The Price–Savings Provision

In § 39–26.1–7(e), the revised LTC statute expounded upon the newly required price-savings provision, one of the preconditions for amended-PPA approval pursuant to § 39–26.1–7(c)(ii). To comply with § 39–26.1–7(e), the amended PPA was required to "provide for terms that shall decrease the pricing if savings can be achieved in the actual cost of the project." Section 39–26.1–7(e)(i). The statute di-

---

**15.** In the 2009 version of § 39–26.1–7, the commission was to apply the definition of "commercially reasonable" found in § 39–26.1–2(1): "terms and pricing that are reasonably consistent with what an experienced power market analyst would expect to see in transactions involving newly developed re-newable energy resources." S 0111A, P.L. 2009, ch. 53, § 1, p. 248. The amended definition narrowed the commission's commercial-reasonableness comparison to projects that were much more similar to the Town of New Shoreham Project than those allowed by the previous definition.

rected that "all realized savings [would be] allocated to the benefit of ratepayers." *Id.* Echoing § 39–26.1–7(a),[16] § 39–26.1–7(e)(ii) also confirmed that the "initial fixed price" from the 2009 PPA was the "maximum initial price" for the amended PPA. Noting that "any realized savings" were to "reduce such price," this section explained that "the price for each year" would be fixed by the amended PPA "[a]fter making any such reduction to the initial price based on realized savings." Section 39–26.1–7(e)(iii) clarified that "at the completion of the construction of the project," the developer would certify the "costs of the project" and then "[a]n independent third-party acceptable to the division" would "verify the accuracy of" the developer's certified costs. Once verified, the division would communicate these "final costs" to National Grid, and the commission thereafter would "reduce the expense to ratepayers consistent with a verified reduction in project costs." *Id.*

### 4

### The Transmission Cable

As for the transmission cable, § 39–26.1–7(f) required that the "project shall include a transmission cable between the Town of New Shoreham and the mainland of the state." Like the 2009 LTC statute, "[t]he electric distribution company, [was permitted] at its option, * * * to own, operate, or otherwise participate in such transmission cable project[,] * * * however, [the electric distribution company also had] the option to decline [the same]."[17] Section 39–26.1–7(f). Added provisions described how the electric distribution com-

pany could acquire a "transmission facilities purchase agreement," (TFPA) and have it approved by the division, if it "elect[ed] to purchase the transmission cable and related facilities from the developer or an affiliate of the developer." *Id.* If the electric distribution company chose to exercise its option to decline participation in the "transmission cable project," a lukewarm contingency for accomplishing transmission-cable installation was covered by § 39–26.1–7(i). Here, the General Assembly explained that the developer "may elect [to own the transmission cable] directly, through an affiliate, or a third-party." Section 39–26.1–7(i).

### E

### The 2010 PPA and the Commission's Docket 4185

### 1

### The 2010 PPA

After absorbing the numerous revisions to § 39–26.1–7, National Grid and Deepwater Wind negotiated an amended PPA (the 2010 PPA) and submitted it to the commission on June 30, 2010.

### i

### Pricing

The 2010 PPA decreased to a miniscule extent the initial bundled price from $235.75/MWh (in the 2009 PPA) to $235.70/MWh, but did not change the applicable 24.4 cents/kWh charge for ratepayers. Just as was planned in the 2009 PPA, this initial price would go into effect in 2012

---

**16.** Section 39–26.1–7(a) states that "[a]ny amendments [to the amended PPA] shall ensure that the pricing can only be lower, and never exceed, the original pricing included in the [2009 PPA] that was reviewed in docket 4111." This section also directs that "pricing terms of such [amended PPA] are amended as

more fully described in subsection 39–26.1–7(e)." Section 39–26.1–7(a).

**17.** In the 2009 LTC statute, this provision was included as § 39–26.1–7(b). S 0111A, P.L. 2009, ch. 53, § 1, p. 253.

with an escalation of 3.5 percent occurring on January 1st each year for twenty years thereafter. However, in consideration of the revised LTC statute's newly required price-savings provisions, the 2010 PPA set forth a mechanism whereby the initial bundled price could be reduced if "[t]otal [f]acility [c]ost" was less than the currently estimated "base amount" of $205,403,512 ($205 million, for simplicity). The 2010 PPA also established the procedures for cost certification by Deepwater Wind, cost verification by an independent third party acceptable to the division, and then reduction in the bundled price based on savings, if any, that National Grid, via its ratepayers, would pay to Deepwater Wind.

## ii

## Costs

Unlike the 2009 PPA, the 2010 PPA explicitly put forth the estimated construction cost or "base amount" of $205 million.

## iii

## Transmission Cable Provisions

The 2010 PPA also adjusted the provisions for the anticipated construction of the transmission cable between Block Island and the mainland. Now, added section 8.5(e) permitted National Grid to go forward with the construction of the transmission cable without Deepwater Wind's or Deepwater Transmission's involvement. Section 8.5(f), formerly section 8.5(e) in the 2009 PPA, also contained an opt-out provision for both National Grid and Deepwater Wind that excused both entities from any obligations for "construct[ing], own[ing], operat[ing], or otherwise participat[ing] in the Transmission Cable."

Other miscellaneous changes to dates, deadlines, regulatory reporting, and renewable energy certificates were imported

into the 2010 PPA, but these changes are not relevant to the matter before us.

## 2

## The Commission's Approval of the 2010 PPA in Docket 4185

In a decision on August 11, 2010,[18] for docket 4185, a majority of the commission, Chairman Elia Germani (Chairman Germani) and Commissioner Paul J. Roberti (Commissioner Roberti), approved the 2010 PPA, while Commissioner Mary E. Bray (Commissioner Bray) withheld her approval and dissented. On a single criterion in the four-factor test, economic-development benefits, Chairman Germani and Commissioner Roberti agreed that the 2010 PPA met the requirements, but they adopted divergent methodologies and therefore filed concurring opinions.

## i

## Majority Opinion

At the outset of its decision, the commission established, without objection, that "in accordance with its [rule of procedure], [it] would take [a]dministrative [n]otice of all documents and testimony in [d]ocket * * * 4111." The two-member majority also recounted the General Assembly's instructions to "tak[e] into account the state's policy intention to facilitate the development of a small offshore wind project in Rhode Island waters, while at the same time interconnecting Block Island to the mainland." (Quoting § 39–26.1–7(c).) To give effect to this legislative intent, the majority stated that it would "interpret[ ] any ambiguities in the law and weigh[ ] the evidence in a manner to effectuate 'the development of a small offshore wind project in Rhode Island waters.'" Chairman Germani and Commissioner Roberti then

18. The written decision was issued by the commission on August 16, 2010.

found, based on the revised LTC statute, that the 2010 PPA was commercially reasonable; the price-savings provision included in the 2010 PPA was sufficient; economic-development benefits likely would inure (albeit basing this conclusion on differing statutory interpretations); and environmental benefits likely would be provided.

In determining that the 2010 PPA was commercially reasonable, the majority explained that the "General Assembly has now included a unique, stand alone definition for this [a]mended PPA" that differs from the definition of "commercially reasonable" applied in docket 4111. Effectively, the majority assessed that "the General Assembly * * * instructed th[e] [c]ommission to accept the high cost of offshore wind technology for a project with limited economies of scale, so long as the slated costs, and concomitant PPA pricing, terms and conditions, duly reflect those costs." Applying this definition, the majority credited Deepwater Wind's IRR analysis, uncontested by the other financial-analyst witnesses, which "indicated that project returns were within the zone of reasonableness." The majority also credited the Deepwater Wind witness's favorable comparison of the 2010 PPA's price to the prices contained in other wind-farm projects when adjusted for size, location, technology, and, on a case-by-case basis, the cost of the cable between the wind turbines and the delivery point.[19] Although the majority noted that the 2010 PPA's price did not include the costs for constructing the transmission cable be-

tween the mainland and Block Island, it was not dissuaded from finding the 2010 PPA commercially reasonable because the comparable projects did not need a "second transmission line." According to the majority, including the transmission cable in the 2010 PPA's price would not have been an "apples-to-apples" comparison to the comparable projects and therefore "would not meet the standards set forth in the statute regarding the locational aspect of the Project."

As for the price-savings provision, the commission was satisfied that the 2010 PPA contained an appropriate mechanism to reduce initial price if savings were realized in the difference between the estimated cost of construction and the actual cost of construction. However, the commission grappled with the 2010 PPA's estimate of construction costs, the "base amount" from which actual construction costs would be deducted. National Grid and Deepwater Wind set the 2010 PPA's "base amount" at $205 million, while the contesting petitioners argued that the "base amount" should be $219,311,412 ($219 million, for simplicity) consistent with the costs articulated by Deepwater Wind in docket 4111's record and at the legislative hearings for the revised LTC statute. In the end, however, the commission sided with the 2010 PPA's $205 million "base amount" because it determined that the $219 million estimate was not intended to be " 'locked in' as part of the [price-savings] provisions of the [revised LTC statute]." The commission explained that "the [revised LTC statute] never use[d] the word 'cost' in conjunction

19. This Court notes that the Town of New Shoreham Project necessarily contemplates two cables. One cable traverses between the wind turbines and the delivery point on Block Island. The other cable, the "transmission cable," connects the delivery point on Block Island to the mainland. When the revised LTC statute (and the 2009 LTC statute) refer

to "the transmission cable," this term means the cable between the mainland and Block Island. *See* § 39–26.1–7(a) (referring to an "undersea transmission cable that interconnects Block Island to the mainland"); § 39–26.1–7(f) (requiring the project to "include a transmission cable between the Town of New Shoreham and the mainland of the state").

with [d]ocket 4111, but it d[id] provide that the 'maximum initial price' shall be tied to [d]ocket * * * 4111." Accordingly, the commission deemed that "the General Assembly was far more concerned with the *price* being capped pursuant to the 2009 PPA," than it was with the $219 million *cost* from docket 4111 being imported wholesale into the 2010 PPA. (Emphasis added.) The commission was further persuaded to use the $205 million "base amount" because "any cost greater than $205 million * * * would imperil the project in terms of financial feasibility" and "would frustrate the entire legislative desire to see that the planned wind farm comes to fruition."

Lastly, the commission found it "of significance" that a National Grid witness testified "that $203.9 million, albeit slightly lower than the latest $205 million projection, was the cost figure upon which [National] Grid relied in negotiating the 2009 PPA['s pricing]." In other words, the price in the 2009 PPA actually was not based on $219 million, as articulated by Deepwater Wind in docket 4111; but instead was based on an estimated cost closer to $205 million. Therefore, because the bundled price in the 2009 PPA was based on a cost estimate close to $205 million, and because the 2010 PPA essentially adopted the bundled price from the 2009 PPA,[20] it then followed that the 2010 PPA also would adopt the same $205 million cost figure used in the 2009 PPA. As such, the commission concluded that the 2010 PPA provided for an adequate price-sav-

ings provision and appropriate "base amount" of $205 million.

Relative to the environmental-benefits factor, the commission first acknowledged the substantial deference afforded to DEM's advisory opinion. Then it confirmed that the 2010 PPA, a part of the Town of New Shoreham Project, was likely to provide environmental benefits. Because the transmission cable between Block Island and the mainland, another required part of the Town of New Shoreham Project, would "eliminat[e] [Block Island's] reliance on its diesel generators," the commission concluded that the 2010 PPA was likely to effect "a reduction in carbon emissions." Commissioner Bray joined with the majority as to this single criterion.

Finally, after noting that there were two separate analyses reaching the same conclusion, the majority confirmed that the 2010 PPA was likely to provide economic-development benefits.

## ii

### Chairman Germani's Concurrence

In his analysis of economic-development benefits, Chairman Germani interpreted the statute as not requiring a "net economic benefit test." Looking at the "plain and ordinary meaning" of § 39–26.1–7(c)(iii), Chairman Germani determined that it "only refers to economic benefits" without a "corresponding reference to the costs." He explained that the General Assembly knew how to require a net-benefit test, as it did in § 39–26.1–8,[21] and if that was how

---

**20.** The initial bundled price in the 2009 PPA was $235.75/MWh, whereas the initial bundled price in the 2010 PPA is $235.70/MWh. Both bundled prices translated to 24.4 cents/kWh for the ratepayers.

**21.** Section 39–26.1–8 describes the installation of a "utility-scale offshore wind farm," a project distinct from the Town of New Shore-

ham Project that includes "at least one hundred (100) megawatts but not more than one hundred fifty (150) megawatts." Section 39–26.1–8(a). In conducting its review, the commission is instructed to examine "[t]he economic impact and potential risks, if any, of the proposal on rates to be charged by the

the Legislature wanted the commission to proceed under § 39–26.1–7(c)(iii), it would have directed as such. Next, Chairman Germani acknowledged that the revised LTC statute directed the commission to "grant substantial deference to an [a]dvisory [o]pinion filed by the EDC." He noted that the IMPLAN model used by the expert selected by the EDC, Seth G. Parker (Mr. Parker),[22] was "a generally accepted input-output model used to measure the benefits of certain cost expenditures." Then, because the EDC opinion adopted the IMPLAN model and established that the 2010 PPA would result in $129 million in economic-development benefits, Chairman Germani concluded that the 2010 PPA satisfied this factor.

### iii

### Commissioner Roberti's Concurrence

Conversely, Commissioner Roberti used a net-benefit test, but nonetheless found that the result favored a finding that the 2010 PPA "likely [would] provide economic development benefits." He so concluded because, after giving due weight to the EDC's opinion that there likely would be $129 million in benefits, the corresponding detriment to Rhode Island businesses, like petitioners, was not quantifiable beyond having to cope with "increased electricity costs." He also noted that the General

Assembly was well aware that the 2010 PPA would cause these above-market electricity costs "in excess of $370 million,"[23] but that the Legislature "still found that the [2010 PPA] was in the public interest." Because there were not hard facts that these businesses absolutely would leave Rhode Island or "curtail existing operations" in the state, Commissioner Roberti concluded that he could not "find sufficient evidence to offset or cancel out the projected economic benefits." As such, Commissioner Roberti also concluded that the 2010 PPA met this "economic development benefits" factor.

### iv

### Commissioner Bray's Dissent

For her part, Commissioner Bray concluded that the project was not commercially reasonable, the price-savings provision was not properly applied, and likely economic-development benefits had not been demonstrated. The dissenting commissioner led off with a statement that, unlike the majority, she would not weigh the evidence or interpret the law in this case any differently from the way she would in any other case.

Then, in assessing commercial reasonableness, she acknowledged that the revisions to the LTC statute limited her com-

electric distribution company." Section 39–26.1–8(b)(i).

**22.** According to the commission's decision, the IMPLAN model was chosen by the EDC-selected expert, Seth G. Parker, vice president and principal of Levitan & Associates, Inc., "a management consulting firm in the power and fuels markets," to establish the projection of economic development benefits. The commission recounted that IMPLAN is "a standardized regional input-output model that allowed [the expert] to quantify the 'multiplier effects' associated with the project's construction and operating activities." Essentially, it "measures the benefits that accrue as a result

of certain expenditures." In a submission to this Court, the petitioners represented that "IMPLAN" is an acronym that stands for "Impact Analysis for Planning."

**23.** Crediting National Grid's testimony, the commission in docket 4111 found that the above-market price for electricity pursuant to the twenty-year 2009 PPA would result in total payments of $390 million more than traditionally generated electricity. For the 2010 PPA in docket 4185, National Grid's recalculations reduced this above-market amount to $370 million and the commission referred to this new figure in its decision.

parison of the 2010 PPA's terms and pricing to "only projects using offshore wind technology with adjustments for small size and location." However, she took exception to the fact that the 2010 PPA's pricing was not adjusted "to reflect the cost of the transmission cable from Block Island to the mainland," while at the same time noting that the transmission-cable construction was not included in the 2010 PPA. Commissioner Bray also went beyond questioning whether the pricing in the 2010 PPA was commercially reasonable, and found that National Grid and Deepwater Wind "failed to meet their burden of proof" as to other terms.

.With respect to the price-savings provision, Commissioner Bray agreed that the 2010 PPA permissibly set an initial price "equal to that of the 2009 PPA" and provided a mechanism to reduce the initial price "if certain cost savings are achieved." However, she disputed that the 2010 PPA could set its base amount at $205 million, thereby using a lesser threshold to calculate savings. She recounted that during the LTC-revision hearings before the General Assembly, Deepwater Wind represented that its construction costs would be $220 million, not $205 million. And although noting there was "conflicting testimony" on the issue of 2009 PPA's pricing, she asserted that "[t]here [was] no dispute that pricing contained in the 2009 PPA was based on a cost estimate of * * * $219 million." As such, because she determined that "pricing in [the 2009 PPA] must be connected to the cost estimates in [the 2009 PPA]" and because the 2010 PPA adopted the 2009 PPA's pricing, Commissioner Bray concluded that the 2010 PPA must also use the 2009 PPA's cost estimate

of $219 million. Because the 2010 PPA did not use the allegedly correct $219 million base amount, she determined that its price-savings provision "does not comply with the standard set forth" in the revised LTC statute.

Lastly, concerning economic-development benefits, Commissioner Bray disagreed that the 2010 PPA achieved this factor. She considered "absurd" the interpretation of the revised LTC statute that the commission should consider economic benefits in isolation from economic detriments. Rather, Commissioner Bray adopted the interpretation that a *net*-benefit test was required. She explained that the commission had used a net-benefit test in docket 4111 based on its regulations implementing § 39–26.1–5(e),[24] even though that statutory section does not specifically require a net-benefit test. She continued that if the General Assembly "wanted to prevent the [c]ommission from [applying its consistent statutory interpretation of] looking at net economic development benefits or the economic harm that higher energy costs cause, [it] could have easily done so." Then applying the net-benefit test, Commissioner Bray compared the benefits (the EDC advisory opinion's $129 million in benefits and the six permanent jobs that Deepwater Wind expected to create) against the $370 million in "above-market power costs." Because she determined that this 3:1 ratio of costs to benefits "result[ed] in a net loss for the economy," she concluded that the 2010 PPA did not provide the requisite economic-development benefits and "should be disapproved."

---

**24.** Section 39–26.1–5(e), related to long-term contracts in general and not the specific Town of New Shoreham Project, states in relevant part: "The commission shall promulgate regulations * * * that shall * * * require all ap-
proved projects * * * to provide other direct economic benefits to Rhode Island, such as job creation, increased property tax revenues or other similar revenues, deemed substantial by the commission."

To close docket 4185, the commission's majority filed order 20095 on August 16, 2010, stating that (1) the 2010 PPA "is hereby approved" and (2) that all motions to dismiss the docket were "denied."

## F

### Petitions for Writs of Certiorari

Within the seven-day time frame for submitting challenges to commission decision-making, based on § 39–1–5, Toray and Polytop, former Attorney General Lynch, and CLF filed separate petitions for a writ of certiorari with this Court seeking review of the commission's approval of the 2010 PPA in docket 4185. This Court granted each writ separately, but then consolidated the petitions on September 23, 2010. Also on September 23, 2010, this Court permitted Rhode Island's then-Governor Carcieri,[25] Rhode Island Senate President, M. Teresa Paiva–Weed, and Rhode Island Speaker of the House of Representatives, Gordon D. Fox, to intervene in support of National Grid and Deepwater Wind. In their petitions, Toray, Polytop, and the former Attorney General disputed various aspects of the commission's application of the revised LTC statute. The former Attorney General and CLF also launched constitutional and jurisdictional challenges upon the underlying revisions to the LTC statute and the administrative proceedings in docket 4185.

Then, on February 21, 2011, after all briefs were filed, this Court granted newly elected Attorney General Kilmartin's request to withdraw the petition for a writ of certiorari filed by his predecessor. Accordingly, whether the remaining parties, Toray, Polytop, and CLF, could establish standing in their own right became a threshold issue that required resolution before this Court could review the merits of their petitions. This Court requested the three petitioning parties, in addition to National Grid and Deepwater Wind, to flesh out this narrow question of standing with written submissions and oral arguments at a show-cause hearing. On April 21, 2011, this Court held that Toray and Polytop had satisfied Rhode Island's requirements for standing, but that CLF had not. A majority[26] of this Court also declined to overlook the issue of standing to permit CLF to remain in the case based on a theory of "substantial public interest."

■ At this juncture, with the Attorney General withdrawn and CLF excluded, we are left to address the statutory concerns of petitioners,[27] the proverbial "last man standing." Before embarking, we wish to convey our firm adherence to the maxim that this Court's "appraisal of the wisdom or unwisdom of a particular course consciously selected by the [Legislature] is to be put aside in the process of interpreting a statute." *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 194, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). Our reviewing role is

---

**25.** This Court notes that subsequent to the filing of the petitions and the intervention of Governor Donald L. Carcieri, Lincoln D. Chafee was elected Governor of Rhode Island and successfully moved to substitute for his predecessor in this case.

**26.** Two members of this Court dissented on the existence of CLF's substantial public interest and countered that "this is one of those 'rare occasions' when it would be appropriate to 'overlook[ ] the standing requirement.' " *In*

*re Review of Proposed Town of New Shoreham Project,* 19 A.3d 1226, 1229 (R.I.2011) (mem.).

**27.** We commend both petitioners and respondents for the extraordinarily thorough legal reasoning and argumentation contained in their written and oral submissions to this Court. We also sincerely appreciate petitioners' efforts to provide this Court with comprehensive and meticulously well-organized appendices in support of their petition.

to apply the law, not to rewrite, footnote, or insert appendices into the General Assembly's codifications.

## II

### Standard of Review and Statutory Interpretation

The legislature has articulated a high bar that a petitioner must surpass before this Court overturns a decision made by the commission. *In re Providence Water Supply Board's Application to Change Rate Schedules*, 989 A.2d 110, 115 (R.I. 2010). We note, however, that our standard for reviewing the commission's decisions is not identical to our review of administrative-agency decisions in general. Section 39–5–1 (establishing that "[G.L. 1956] [c]hapter 35 of title 42 [entitled Administrative Procedures Act] shall not be applicable to appeals from the commission"). Instead, this Court's review is dictated by chapter 5 of title 39. *See also* § 39–26.1–7(d) (establishing that this Court's review of the commission's decision involving the Town of New Shoreham Project also is prescribed by chapter 5 of title 39).[28]

### A

#### Questions of Fact

■ From the outset of this review, this Court must presume that "[t]he findings of the commission on questions of fact shall be held to be prima facie true * * *." *In re Kent County Water Authority Change Rate Schedules*, 996 A.2d at 128 (quoting § 39–5–3). "[O]ur mission is to determine * * * whether its findings of fact are 'fairly and substantially supported by legal evidence.' " *Id.* (quoting *New England Telephone & Telegraph Co. v. Public Utilities Commission*, 446 A.2d 1376, 1380 (R.I.1982)). However, we are constrained from "exercis[ing] [our] independent judgment [or] weigh[ing] conflicting evidence." *Id.* (quoting § 39–5–3). Moreover, unless we observe that the credited testimony is obviously erroneous, our review does not pique interest with witness credibility, an assessment that remains within the province of the commission. *Newport Electric Corp. v. Town of Portsmouth*, 650 A.2d 489, 492 (R.I.1994) (citing *Yellow Cab Co. v. Freeman*, 109 R.I. 164, 165, 282 A.2d 595, 596 (1971)). Accordingly, this Court's deference to the commission's factual findings is all but absolute. *See Pine v. Malachowski*, 659 A.2d 674, 676 (R.I.1995) ("The factual determinations of the commission are conclusive upon this [C]ourt and are generally unassailable if supported by legal evidence.").

### B

#### Questions of Law

■ As is customary in our appellate proceedings, pure questions of law, including statutory interpretations, decided by the commission are reviewed *de novo* by this Court. *In re Narragansett Bay Commission General Rate Filing*, 808 A.2d 631, 635 (R.I.2002); *City of East Providence v. Public Utilities Commission*, 566 A.2d 1305, 1307 (R.I.1989). To ascertain a statute's meaning, "we are mindful that 'our ultimate goal is to give effect to the General Assembly's intent.' " *State v. Graff*, 17 A.3d 1005, 1010 (R.I.2011) (quoting *Martone v. Johnston School Committee*, 824 A.2d 426, 431 (R.I.2003)). If this

---

**28.** We also acknowledge that § 39–26.1–7(d) requested this Court's prioritized review of the commission's decision on the Town of New Shoreham Project. *See* § 39–26.1–7(d) ("[T]he [S]upreme [C]ourt shall advance any proceeding under this section so that the matter is afforded precedence on the calendar and shall be heard and determined with as little delay as possible.").

Court determines that "the language of a statute is clear and unambiguous," we have our oft-relied-upon precedent for acquiring the intentions of the Legislature: "interpret the statute literally" and "give the words of the statute their plain and ordinary meanings." *In re Narragansett Bay Commission General Rate Filing*, 808 A.2d at 636 (quoting *Cummings v. Shorey*, 761 A.2d 680, 684 (R.I.2000)); *McGuirl v. Anjou International Co.*, 713 A.2d 194, 197 (R.I.1998) (" 'When the language of a statute is unambiguous and expresses a clear and sensible meaning, there is no room for statutory construction or extension, and we must give the words of the statute their plain and obvious meaning. * * * Such meaning is presumed to be the one intended by the Legislature * * *.' ") (quoting *Wayne Distributing Co. v. Rhode Island Commission For Human Rights*, 673 A.2d 457, 460 (R.I.1996)). In such unambiguous circumstances, we proceed with a true *de novo* review and need not give any deference to the agency's statutory interpretation.[29] *See McGuirl*, 713 A.2d at 197.

■ If, however, we ascertain an actual ambiguity in the statute, not one styled by skilled attorneys,[30] then this Court will "employ our well-established maxims of statutory construction in an effort to glean the intent of the Legislature." *Town of Burrillville v. Pascoag Apartment Associ-*

ates, *LLC*, 950 A.2d 435, 445 (R.I.2008) (quoting *Unistrut Corp. v. State Department of Labor and Training*, 922 A.2d 93, 98–99 (R.I.2007)). Of import here, "when a statute is susceptible of more than one meaning," we must subscribe to the canon of statutory construction that gives due consideration to the agency's interpretation. *Id.* To resolve which of the two or more permissible statutory interpretations will control, we "give deference to an agency's interpretation of an ambiguous statute that it has been charged with administering and enforcing, provided that the agency's construction is neither clearly erroneous nor unauthorized." *Id.* (quoting *Rossi v. Employees' Retirement System*, 895 A.2d 106, 113 (R.I.2006)); *see also Pawtucket Power Associates Limited Partnership v. City of Pawtucket*, 622 A.2d 452, 456, 457 (R.I.1993) (concluding, in the context of an appeal from a declaratory judgment, that because the statute was susceptible to more than one permissible meaning, the trial justice "should have applied a more deferential standard in defining a term that had already been defined by the [commission]" and explaining that "a declaratory judgment of the [commission] concerning whether [Pawtucket Power Associates] constituted a public utility [by statute] * * * has great

---

29. The petitioners seem to argue that a *de novo* standard of review applies to every instance of statutory interpretation by the commission. However, they have cited only to cases in which this Court deemed the statute in question unambiguous. Accordingly, in petitioners' cited circumstances it was not necessary for this Court to defer to the commission's interpretation. However, when there is an ambiguity in a "statute that [the agency] has been charged with administering and enforcing," deference to its interpretation is appropriate "provided that the agency's construction is neither clearly erroneous nor unauthorized." *Town of Burrillville v. Pascoag Apartment Associates, LLC*, 950 A.2d 435,

445 (R.I.2008) (quoting *Rossi v. Employees' Retirement System*, 895 A.2d 106, 113 (R.I. 2006)).

30. "Because ambiguity lurks in every word, sentence, and paragraph in the eyes of a skilled advocate * * * the question is not whether there is an ambiguity in the metaphysical sense, but whether the language has only one reasonable meaning when construed, not in a hypertechnical fashion, but in an ordinary, common sense manner." *Lazarus v. Sherman*, 10 A.3d 456, 464 (R.I.2011) (quoting *Paul v. Paul*, 986 A.2d 989, 993 (R.I. 2010)).

persuasive force"). In effect, "[t]he interpretation of a statute by the administering agency is not controlling, but it is entitled to great weight." *Pascoag Apartment Associates, LLC,* 950 A.2d at 445–46. This level of deference is applied "even when the agency's interpretation is not the only permissible interpretation that could be applied." *Auto Body Association of Rhode Island v. State Department of Business Regulation,* 996 A.2d 91, 97 (R.I. 2010) (quoting *Pawtucket Power Associates Limited Partnership,* 622 A.2d at 456–57). Nonetheless, we do not, as respondents implore, afford an agency's statutory interpretation deference in every case. It is only when we are faced with an ambiguous statute and must resort to " 'maxims of statutory construction' " that this Court will give weight to the agency's articulated interpretation. *Pascoag Apartment Associates, LLC,* 950 A.2d at 445; *Pawtucket Power Associates Limited Partnership,* 622 A.2d at 456–57. And of course, regardless of ambiguities or deference due, this Court always has the final say in construing a statute. *See Pascoag Apartment Associates, LLC,* 950 A.2d at 445 ("[T]his Court is the final arbiter of questions of statutory construction.") (quoting *Rossi,* 895 A.2d at 113).

## C

### Application of Law to Facts and Ultimate Decision–Making

 Our evaluation of the commission's application of law to facts and its ultimate decision-making, provided that the commission is applying a proper interpretation of the law, is deferential and concerns itself with whether the commission has "ruled in a 'lawful and reasonable' manner." *In re Kent County Water Authority Change Rate Schedules,* 996 A.2d at 128 (quoting *New England Telephone & Telegraph Co.,* 446 A.2d at 1380); *see*

§ 39–5–3. To assist us in conducting this portion of our review, we require that the commission's findings are "sufficiently specific to enable us to ascertain if the facts upon which they are premised afford a reasonable basis for the result reached." *Providence Gas Co. v. Malachowski,* 656 A.2d 949, 951 (R.I.1995) (quoting *Providence Gas Co. v. Burke,* 475 A.2d 193, 199 (R.I.1984)). If the commission fails "to set forth sufficiently the findings and the evidentiary facts upon which it rests its decision, or the reasons or true bases for its conclusions, we will not speculate thereon nor search the record for such evidence or reasons. Neither will we decide for ourselves what is proper in the circumstances." *Blackstone Valley Chamber of Commerce v. Public Utilities Commission,* 121 R.I. 122, 130, 396 A.2d 102, 106 (1979). Once satisfied that the commission provided adequate support for its conclusions, this Court will not reverse the "administrative *discretion*" of an order or judgment made by the commission "unless the commission exceeded its authority or acted illegally, arbitrarily, or unreasonably." *In re Kent County Water Authority Change Rate Schedules,* 996 A.2d at 128 (quoting § 39–5–3) (emphasis added). Without question, a "petitioner has a difficult burden to bear." *In re Kent County Water Authority Change Rate Schedules,* 996 A.2d at 128.

## III

### Analysis

Here, petitioners quarrel with the commission's approval of the 2010 PPA in almost every regard. Taking aim at aspects of the 2010 PPA ancillary to the four-factor test, set forth in § 39–26.1–7(c)(i) through (iv), petitioners lodge four discrete challenges against (1) the allegedly excessive deference that the majority applied to its review of the 2010 PPA, (2) the alleged-

ly inadequate time frame statutorily allotted for the commission's review, (3) the 2010 PPA's lack of a firm commitment from National Grid or Deepwater Wind to construct the transmission cable, and (4) the 2010 PPA's stabilizing of energy prices within the meaning of the revised LTC statute.

The petitioners also attack the commission's findings on each of the four factors: (1) the commercial reasonableness of the 2010 PPA, § 39–26.1–7(c)(i), (2) the propriety of the 2010 PPA's price-savings provision, § 39–26.1–7(c)(ii), (3) the likelihood that the 2010 PPA will provide economic-development benefits, § 39–26.1–7(c)(iii), and (4) the likelihood that the 2010 PPA will provide environmental benefits, § 39–26.1–7(c)(iv). We shall address these issues, along with their branched subparts, *seriatim.*

## A

### Challenges Ancillary to § 39–26.1–7(c)'s Four–Factor Test

In their attempt to invalidate the commission's approval of the 2010 PPA, some of petitioners' complaints look to other subsections of § 39–26.1–7, outside of the specific four-factor test delineated by § 39–26.1–7(c)(i) through (iv).

### 1

### The Commission's Deference to the 2010 PPA

The petitioners' first contention is that the commission afforded the 2010 PPA far too much deference in favor of approval rather than reviewing the agreement's terms through an independent, neutral lens as dictated by the statute governing the commission's general reviewing authority. *See* § 39–1–11 (explaining that the commission "sit[s] as an impartial, independent body, and is charged with the duty of rendering independent decisions affecting the public interest and private rights based upon the law and upon the evidence presented before it"). Although § 39–1–11 applies here, § 39–26.1–7(c) also instructed "[t]he commission [to] review the [2010 PPA] taking into account the state's policy intention to facilitate the development of a small offshore wind project in Rhode Island waters, while at the same time interconnecting Block Island to the mainland." In light of this statutory direction from the General Assembly, the commission's majority purported to resolve "any ambiguities in the law and weigh the evidence in a manner to effectuate" the state's policy intentions.

Recoiling at the majority's modified standard of review, petitioners assert that this standard "would *always* result in approval of the PPA" and therefore was improper. The petitioners instead align themselves with the standard of review articulated in Commissioner Bray's dissent where she declared that she would not "weigh[ ] the evidence or interpret[ ] the law" any differently from the way she "would in any other case." She declined to "add[ ] any presumption that the outcome of [her] decision must meet the policy goals of * * * § 39–26.1–7."

Regardless of petitioners' arguments otherwise, this Court is not convinced that the commission's majority took on the role of a "rubber stamp" and approved the 2010 PPA regardless of its view of the record. Given the commission's 129–page recitation of the presented evidence and the additional 18 pages of findings and conclusions, we are of the opinion that the commission's majority properly adhered to its § 39–1–11 statutory standard of review while giving appropriate and necessary consideration to § 39–26.1–7(c). The petitioners are hard-pressed to convince this Court that the commission

exceeded its authority by resolving "any ambiguities in the law and weigh[ing] the evidence in a manner to effectuate" the legislature's intent. In reality, by directing the commission to "tak[e] into account the state's policy intention," this is what the General Assembly in § 39–26.1–7(c) asked the commission to do. *See Saysana v. Gillen*, 590 F.3d 7, 12 (1st Cir.2009) ("[C]ourts, as well as the agency, 'must give effect to the unambiguously expressed intent of [the Legislature].'") (quoting *Succar v. Ashcroft*, 394 F.3d 8, 22 (1st Cir.2005)). Conversely, Commissioner Bray seems to relegate the introductory language in § 39–26.1–7(c) to "mere surplusage" by refusing to give any effect to the legislative direction to take into account the state's policy goals. *In re Harrison*, 992 A.2d 990, 994 (R.I.2010) ("[N]o construction of a statute should be adopted that would demote any significant phrase or clause to mere surplusage.") (quoting *State v. Clark*, 974 A.2d 558, 572 (R.I. 2009)). In our view, Commissioner Bray's interpretation is not what the General Assembly had in mind. Accordingly, we are satisfied that the majority did not err by articulating a statutorily directed variation in their usual standard of review, nor did the majority abdicate its responsibility to fairly and independently review the evidence.

[c]ommission rate decision must be tempered by the 45–day rush to judgment." We observe that this subjective argument is not properly before us because petitioners did not raise any suggestion of this issue in their petition for a writ of certiorari. *Town of Burrillville v. Rhode Island State Labor Relations Board*, 921 A.2d 113, 119 (R.I.2007) ("[A]s we have previously held, we will not consider any issue that is not included in a petitioner's initial petition for issuance of a writ of certiorari."); *see also* § 39–5–1 ("The petition for a writ of certiorari shall fully set forth the specific reasons for which it is claimed that the [commission's] decision or order is unlawful or unreasonable.").

Furthermore, even if this challenge was procedurally proper, this Court declines to accept petitioners' invitation to substitute their judgment for that of the Legislature. The revised LTC statute unambiguously requires the commission to make a decision within forty-five days, § 39–26.1–7(d), and unambiguously omits any direction that this Court should moderate its usual deference to the commission's fact-finding. Accordingly, we shall apply the law as it is written. *WMS Gaming, Inc. v. Sullivan*, 6 A.3d 1104, 1113 (R.I.2010) (citing *International Brotherhood of Police Officers v. City of East Providence*, 989 A.2d 106, 108 (R.I.2010)).

### 2

### The Time Frame for the Commission To Conduct its Review

In another argument residing outside the bounds of the four-factor test, petitioners contend that the forty-five-day time frame statutorily allotted for the commission's review was not sufficient for the panel "to fully study and evaluate the issues." They accordingly conclude that "the usual deference on findings of fact [that this Court] give[s] to a 9–month

### 3

### The Lack of a Firm Commitment for Deepwater Wind or National Grid To Construct, Own, or Operate the Transmission Cable

As arguably their most strident objection to the 2010 PPA's approval, petitioners raise a transmission-cable argument that branches into three distinct contentions. All three branches, however, germinate from the common argumentative root that the 2010 PPA lacked mandatory pro-

visions for the transmission cable. In the first branch ("statutory challenge"), petitioners assert that based on the revised LTC statute's articulated purposes and intentions, the 2010 PPA must contain provisions requiring construction and operation of a transmission cable between Block Island and the mainland. Because the 2010 PPA does not contain such obligations, petitioners assert that the commission erred by approving the 2010 PPA.

In the second branch ("inconsistent PPA challenge"), petitioners allege that the 2009 PPA contained a firm commitment to construct the transmission cable, but that an amendment in the 2010 PPA diluted this commitment. The petitioners contend that this alteration from the 2009 PPA to the 2010 PPA was an unauthorized amendment. Therefore, they conclude, the commission should have rejected out of hand the entire 2010 PPA as it was polluted by its unauthorized amendment.

Finally, in the last branch ("omission of transmission-cable costs"), petitioners argue that the 2010 PPA was not commercially reasonable because its pricing does not incorporate costs for the transmission cable. The petitioners maintain that if these costs were included, the 2010 PPA would fail the commission's IRR and pricing-term-comparison analyses for commercial reasonableness. Because this third challenge concerning the transmission cable implicates the first factor of § 39–26.1–7(c)'s four-factor test, commercial reasonableness, we shall wait until part B of our opinion to address it.

i

### Statutory Challenge

Although § 39–26.1–7(c)(i)–(iv)'s four-factor test does not mention the phrase "transmission cable," petitioners vehemently maintain that the revised LTC statute requires the 2010 PPA to address all aspects of the transmission cable's construction, ownership, operation, and pricing. Because the 2010 PPA, on its face, does not confer definite transmission-cable construction, petitioners argue that the 2010 PPA violates the statute. We disagree and instead hold that the revised LTC statute does not require that the 2010 PPA must conclusively provide for a transmission cable.

To support their argument, petitioners essentially cherrypick and then cobble together the overarching policy goals for the Town of New Shoreham Project to form what they allege is a transmission-cable mandate for the 2010 PPA. Primarily, this Court notes that the Town of New Shoreham Project and the 2010 PPA are not one and the same. Section 39–26.1–7(a) clarifies that "the Town of New Shoreham project" is encompassed by "its associated power purchase agreement, transmission arrangements, and related costs." Essentially, the 2010 PPA and the transmission arrangements are separate, albeit integral, parts under the umbrella of the Town of New Shoreham Project. *See also* § 39–26.1–7(f) (referring to National Grid's optional participation in the "transmission cable project"); § 39–26.1–7(g) (distinguishing the "transmission cable project" from "the Town of New Shoreham Project"). As such, petitioners are incorrect that their citations to the general policy goals for the Town of New Shoreham Project create an express mandate for the 2010 PPA.

For example, petitioners laud the introductory language in § 39–26.1–7(c) as supporting their position that the transmission cable is an "initial requirement" that the 2010 PPA must meet. Section 39–26.1–7(c) states "[t]he commission shall review the [2010 PPA] taking into account the state's policy intention to facilitate the development of a small offshore wind project

in Rhode Island waters, while at the same time interconnecting Block Island to the mainland." Nothing about this language is a mandate for the 2010 PPA to include a transmission cable, nor does it require the commission's review to examine whether the 2010 PPA specifically provides for a transmission cable. It simply asks the commission to *bear in mind* the General Assembly's overarching goals for the Town of New Shoreham Project when reviewing the 2010 PPA. *See Granite City Division of National Steel Co. v. Illinois Pollution Control Board*, 155 Ill.2d 149, 184 Ill.Dec. 402, 613 N.E.2d 719, 733–34 (1993) (explaining that the general meaning for "take into account" is: "allow for, make allowance for, weigh carefully, consider, take into consideration, bear in mind, remember, realize, appreciate, have in one's mind") (internal quotation marks omitted). Because the 2010 PPA and the transmission-cable project are parts of the Town of New Shoreham Project, initiating the 2010 PPA necessarily is a step toward accomplishing the other goals set forth by the Legislature, namely completion of the transmission cable. We cannot see how the commission failed to "take into account" these goals when reviewing the 2010 PPA; and, more importantly, we decline to glean a mandatory transmission-cable requirement for the 2010 PPA from § 39–26.1–7(c)'s general, nonspecific language. *See Travis County District Attorney v. M.M.*, No. 03–08–00241–CV, slip op. at 7, 7 n. 5, 18, 2010 WL 3058950, —— S.W.3d ——, ——, —— n. 5, —— (Tex. Ct.App. filed Aug. 6, 2010) (explaining that "take into account" is an "exceedingly general," "nonspecific phrase"); *see also Granite City Division of National Steel Co.*, 184 Ill.Dec. 402, 613 N.E.2d at 733, 734 (holding that "'take into account' [technical feasibility and economic reasonableness] in promulgating regulations" means only that the agency must "consid-

er" whether the regulation will meet this criteria and not that the agency must "make a determination" that the criteria will be met).

The petitioners also tout § 39–26.1–7(a) as supportive. Section 39–26.1–7(a) articulates that "[t]he general assembly finds it is in the public interest for the state to facilitate the construction of a small-scale offshore wind demonstration project off the coast of Block Island, including an undersea transmission cable that interconnects Block Island to the mainland" and that "the Town of New Shoreham project" is "[t]o effectuate the[ ] goal[ ]" of "provid[ing] the Town of New Shoreham with an electrical connection to the mainland." Assuredly, this language emphasizes the General Assembly's desire for a transmission cable; however, petitioners fail to recognize that § 39–26.1–7(a)'s policy intention for a transmission cable and specific goal of interconnecting Block Island were directed at the "Town of New Shoreham project" to "effectuate," not at the 2010 PPA to "effectuate" on its own. Accordingly, this statutory provision likewise does not convince us that the revised LTC statute directs that the 2010 PPA contain a mandatory transmission-cable requirement.

Most persuasive that the 2010 PPA need not include provisions for the transmission cable are the revised LTC statute's § 39–26.1–7(f) and (i). *See Ryan v. City of Providence*, 11 A.3d 68, 71 (R.I. 2011) (establishing that when "giving words their plain-meaning," "it would be 'foolish and myopic literalism to focus narrowly on' one statutory section" and "[w]hen we determine the true import of statutory language, it is entirely proper for us to look to 'the sense and meaning fairly deducible from the context'") (quoting *In re Brown*, 903 A.2d 147, 150 (R.I.2006)). Together these two sections outline the

various options for completing transmission-cable arrangements, but very obviously do not require that such arrangements must be included within the 2010 PPA—although they "shall" be included in the umbrella "project." Section 39–26.1–7(c). In fact, § 39–26.1–7(f) necessarily presumes that the "transmission cable project" is distinct from the 2010 PPA because it provides for separate proceedings by which National Grid, if choosing to participate in the transmission-cable project, would negotiate a "Transmission Facilities Purchase Agreement" (TFPA) with Deepwater Wind. Further indicating the separateness of the TFPA and the 2010 PPA, § 39–26.1–7(f) directs National Grid to send the TFPA to the *division* for its "consent to execution," a procedure that is materially different from the 2010 PPA, which is sent to the *commission* per § 39–26.1–7(b), (c), (d). This subsection also contemplates the option of "state tariffs or rates [being] put into effect in order to implement the intention of this [transmission-cable] section" and having the commission "accept filings of the same and shall approve them." Section 39–26.1–7(f). Based on the foregoing, it is clear to us that § 39–26.1–7(f) envisioned construction of the transmission cable to proceed under a separate contractual agreement. "When the Legislature has spoken clearly, this Court will not infer a contrary result. 'It is not the function of this [C]ourt to rewrite or to amend statutes enacted by the General Assembly.'" *Pierce v. Pierce,* 770 A.2d 867, 872 (R.I.2001) (quoting *Rhode Island Federation of Teachers, AFT, AFL–CIO v. Sundlun,* 595 A.2d 799, 802 (R.I.1991)). In no way can petitioners construe § 39–26.1–7(f) as supporting their position that the 2010 PPA between National Grid and Deepwater Wind must include the transmission cable.

This Court notes that § 39–26.1–7(i) provides for a potential contingency if National Grid exercises its statutory opt-out from owning the transmission cable. In such circumstance, Deepwater Wind "*may elect* to [own the transmission cable] directly, through an affiliate, or a third-party" and then, and only then, is "the [2010 PPA] pricing * * * adjusted to allow the developer, an affiliate or a third-party, to recover the costs * * * of the transmission facilities." In no way does "may elect" bind Deepwater Wind to determine how to build the transmission cable under the 2010 PPA, nor does it generally require that the transmission cable must be constructed or operated pursuant to the 2010 PPA. *See Downey v. Carcieri,* 996 A.2d 1144, 1151 (R.I.2010) ("It is an axiomatic principle of statutory construction that the use of the term 'may' denotes a permissive, rather than an imperative, condition.").[31] Section 39–26.1–7(i) simply

---

31. We note that "[e]ven though the word 'may' ordinarily suggests a power rather than a duty, this rule is not slavishly followed where the contrary is indicated by a statute's context." 3 Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutory Construction* § 57:3 at 27–28 (7th ed.2008). "[I]n certain instances, the word 'may' has the effect of 'must.'" *Id.* at 28–29 (quoting *Driscoll v. East–West Dairymen's Association,* 52 Cal. App.2d 468, 126 P.2d 467, 469 (1942)). For example, "[t]he word 'may' is construed as mandatory when the statute in question concerns the public interest or affects the rights of third persons." *Id.* at 31. However, here, we are strongly directed to cast any "may means must" considerations aside using the canon of construction that the Legislature expects each word, "shall" and "may," to don its ordinary meaning if "both words are used in the same statute." *Id.* at 23 & n. 9 (quoting *Woodbury v. Brown–Dempsey,* 108 Cal. App.4th 421, 134 Cal.Rptr.2d 124, 133 (2003)). In the revised LTC statute, both terms are used and, furthermore, the statute's context does not espouse that the 2010 PPA must include the transmission cable. As such, this Court is satisfied that the traditional definition of "may" applies to § 39–26.1–

provides Deepwater Wind with its *permissive* options for transmission-cable ownership and directions for the transmission cable's eventual owner to be reimbursed for the costs of construction. This subsection again militates away from petitioners' interpretation that there was a statutory requirement that the 2010 PPA include mandatory transmission-cable provisions.

Lastly, this Court notes that no member of the commission took issue with the lack of mandatory transmission-cable provisions in the 2010 PPA. The majority and dissent both noted that the *cost* of the transmission cable was not included in the 2010 PPA's pricing, but neither faulted the 2010 PPA for failing to establish a mandate for transmission-cable construction or operation. Commissioner Bray went so far as to acknowledge that the transmission cable "was a necessary component of the proposed [p]roject," but did not balk at the fact that its construction agreement was "not included in the [2010] PPA." As such, even if we were inclined to hold that there was an ambiguity as to the existence or nonexistence of a statutory transmission-cable mandate, which we do not, this Court would be required to afford deference to the commission's authorized "interpretation of an ambiguous statute that it has been charged with administering and enforcing." *Pascoag Apartment Associates, LLC,* 950 A.2d at 445 (quoting *Rossi,* 895 A.2d at 113). Because the entire commission was not clearly erroneous when it also confirmed that the 2010 PPA's ab-

sence of a firm commitment for the construction and operation of the transmission cable did not violate the statute, its conclusion only bolsters our independent assessment of the same.

**ii**

### Inconsistent PPA Challenge

■■■ In a variation of their statutory contention concerning the absence of a binding transmission-cable mandate in the 2010 PPA, petitioners expound, in both their primary and reply briefs, that the 2010 PPA improperly enlarged the transmission-cable opt-out provisions to include both National Grid and Deepwater Wind.[32] They contend that this amendment ("the cable opt-out amendment") contained in the 2010 PPA is inconsistent with the prior 2009 PPA's opt-out provision, which included only National Grid,[33] and therefore it violates the General Assembly's instructions in § 39–26.1–7(a) for generating the 2010 PPA. However, yet again, petitioners failed to raise this specific argument in their petition for a writ of certiorari. Although petitioners speak to the alleged statutory transmission-cable requirements in their petition for certiorari and memorandum, both documents are devoid of a specific comparison of the 2010 PPA's terms to the 2009 PPA's terms. As such, we deem this argument waived. *Rhode Island State Labor Relations Board,* 921 A.2d at 119; *see also* § 39–5–1. Nevertheless, petitioners may rest assured that,

---

7(i). *See generally Nolan v. Representative Council of Newport,* 73 R.I. 498, 504–07, 57 A.2d 730, 733–35 (1948) (summarizing how to look to the legislative intent when determining whether "may" means "shall" or when "may" actually means "may").

**32.** The 2010 PPA in section 8.5(f) states: "Nothing set forth in this [2010 PPA], including this [s]ection 8.5, shall obligate Buyer [National Grid] or any Affiliate of Buyer, Sell-

er [Deepwater Wind], or any Affiliate of Seller, to construct, own, operate or otherwise participate in the Transmission Cable."

**33.** The 2009 PPA in section 8.5(e) states: "Nothing set forth in this [2009 PPA], including this [s]ection 8.5, shall obligate Buyer [National Grid] or any Affiliate of Buyer to own, operate or otherwise participate in the Transmission Cable."

even if their PPA-consistency issue was procedurally proper, this Court would hold that it lacks merit. We briefly shall expound.

In § 39–26.1–7(a), the General Assembly "authorized" National Grid "to enter into an amended power purchase agreement[, the 2010 PPA,]" with Deepwater Wind "on terms that are consistent with the [2009 PPA]." The Legislature also permitted the parties to incorporate amendments into the 2010 PPA that are inconsistent with the 2009 PPA if they (1) "chang[e] dates and deadlines," (2) amend the "pricing terms of such agreement," or (3) "are made to take into account the provisions of [the revised LTC statute]." Section 39–26.1–7(a). Here, our inquiry becomes: (1) was the "cable opt-out amendment" in the 2010 PPA consistent with the 2009 PPA; (2) and if not, is this amendment still authorized because it was "made to take into account the provisions of [the revised LTC statute] as amended since * * * docket 4111." *Id.* Put another way, if the "cable opt-out amendment" is inconsistent with the 2009 PPA, but was not "made to take into account" the revised parts of the LTC statute, then the 2010 PPA was unauthorized and should not have been approved by the commission.

Investigating part one of our analysis, we note that the revised LTC statute did not define the word "consistent" or "inconsistent." "When, as is the case here, a statute does not define a word, courts will often apply a common meaning as provided by a recognized dictionary." *Planned Environments Management Corp. v. Robert,* 966 A.2d 117, 123 (R.I.2009). Black's Law Dictionary defines "inconsistent" as "[l]acking agreement among parts; not compatible with another fact or claim."

Black's Law Dictionary 834 (9th ed.2009). The dictionary definition for "inconsistent" is "[l]acking * * * logical relation; contradictory * * * [n]ot in agreement or harmony; incompatible." The American Heritage Dictionary of the English Language 888 (4th ed.2006). Establishing that an amendment contained in the 2010 PPA is inconsistent or not compatible with terms in the 2009 PPA, as opposed to concluding that terms in the 2010 PPA are not identical to or are different from the 2009 PPA,[34] is a more protracted, nuanced task.

During oral argument, National Grid's attorney suggested to this Court that section 8.5(a) in the 2009 PPA previously contemplated or anticipated the "cable opt-out amendment" that was added by the 2010 PPA. He therefore submitted that the 2010 PPA's "cable opt-out amendment" is "consistent" or "compatible" with the terms in the 2009 PPA. In no way, he argued, could the "cable opt-out amendment" be considered "incompatible" or "inconsistent" with anything that was in the 2009 PPA. We agree.

Section 8.5(a) of the 2009 PPA states: "In the event that * * * the Transmission Cable Conditions are not satisfied on or before December 31, 2010 * * *, then, * * *, *either Party may terminate* this Agreement [the 2009 PPA] by giving written notice * * * to the other Party * * *." (Emphasis added.) The "Transmission Cable Conditions" refer to the completion of three agreements and one regulatory approval involving the transmission cable. In effect, if the "Transmission Cable Conditions" were not achieved by a certain date, then section 8.5(a) *permitted* either National Grid or Deepwater Wind to terminate the 2009 PPA, but did not *require* either party to terminate the 2009 PPA.

---

**34.** In their reply brief, petitioners basically equate "not consistent" with "not identical." They do not explore whether the additional

language in section 8.5(f) of the 2010 PPA was "consistent" with the 2009 PPA's terms; rather they simply presume that it is not.

Of the four conditions comprising the "Transmission Cable Conditions," the "Transmission Cable Purchase Agreement" (TCPA) is the most relevant to the instant issue concerning the alleged inconsistency between the two PPAs. The TCPA is "the agreement between Deepwater Transmission and [National Grid] pursuant to which Deepwater Transmission will construct the Transmission Cable and * * * [National Grid] will purchase the Transmission Cable." Because TCPA completion is one component of the "Transmission Cable Conditions," section 8.5(a) of the 2009 PPA anticipated that the transmission cable may not be constructed. Moreover, because noncompletion of the "Transmission Cable Conditions" prompted permissive, but not mandatory, termination of the 2009 PPA, section 8.5(a) also contemplated that even without the transmission cable, the 2009 PPA still could proceed with the wind farm. Accordingly, because the 2009 PPA's section 8.5(a) envisioned a scenario in which the transmission cable would not be constructed but that the 2009 PPA would proceed, the 2009 PPA's terms are consistent with the 2010 PPA's "cable opt-out amendment," which envisions Deepwater Wind declining to construct the transmission cable but the 2010 PPA still proceeding with the wind farm nonetheless.

Because the 2010 PPA's allegedly offending amendment is consistent with the 2009 PPA, we need not examine the second part of the analysis: whether the "cable opt-out amendment" still is authorized because it was "made to take into account" revisions in the LTC statute.[35] Section 39–26.1–7(a). In our view, the "cable opt-out amendment" was authorized by § 39–26.1–7(a), and it was not error for the commission to approve the 2010 PPA.

## 4

### Stabilizing Long–Term Energy Prices

Because the 2010 PPA calls for an annual 3.5 percent increase in bundled electricity pricing over the course of twenty years, petitioners contend that it fails to meet a general policy goal of § 39–26.1–1: "stabiliz[e] long term energy prices." Without question, this is not one of § 39–26.1–7(c)'s four factors that apply to the commission's review of the 2010 PPA or one of the specific policy goals for the Town of New Shoreham Project; it simply is an overarching policy aimed at in the "Long–Term Contracting Standard for Renewable Energy" statute in general. Section 39–26.1–1 ("The purpose of this chapter is to encourage and facilitate the creation of commercially reasonable long-term contracts * * * [for] newly developed renewable energy resources with the goals of stabilizing

---

**35.** Even if we did continue our analysis, the "cable opt-out amendment" satisfies this second part, as well. As stated above, the revised LTC statute does not specifically require that any entity, Deepwater Wind included, *must* construct the transmission cable under the 2010 PPA. If such a statutory provision did exist, then that provision would be contravened by Deepwater Wind's option to opt-out of constructing the transmission cable contained in the 2010 PPA. Therefore, the parties could not possibly have considered such a statutory provision or "take[n] [this provision] into account" when making the "cable opt-out amendment." Accordingly, although the

"cable opt-out amendment" adds language to the 2010 PPA that was not in the 2009 PPA, this Court cannot say that this amendment was not "made to take into account the provisions of [the revised LTC statute]." Based on our interpretation, the revisions to the LTC statute (as well as the prior statute) are silent as to a cable-construction mandate for Deepwater Wind. As such, in negotiating the 2010 PPA, National Grid and Deepwater Wind seemingly "t[ook] into account" the revised LTC statute's silence by taking it upon themselves to contractually minimize Deepwater Wind's obligations.

long-term energy prices * * *.".). As such, it was not necessary for the commission, or the 2010 PPA, to speak directly to this condition.

Moreover, when read in context with the other goals of § 39–26.1–1, this platitude about stabilizing energy prices very clearly is a reference to weaning Rhode Island from the uncertain rising prices and the limited supply of fossil fuels. *See Ryan,* 11 A.3d at 71 ("When we determine the true import of statutory language, it is entirely proper for us to look to 'the sense and meaning fairly deducible from the context.'") (quoting *In re Brown,* 903 A.2d at 150). Along with stabilizing energy prices, § 39–26.1–1 lists the other goals of "enhancing environmental quality, creating jobs in Rhode Island in the renewable energy sector, and facilitating the financing of renewable energy generation within the jurisdictional boundaries of the state * * *." The "stabilizing" the General Assembly was seeking appears to be inextricably bound to the overall goal of freeing the state's residents from the unpredictabilities associated with fossil fuels.

Furthermore, having a foreseeable, known schedule of prices for twenty years meets the definition of "stabilize" that petitioners define as "keep from changing or fluctuating." A steady price schedule, although increasing each year, does not "fluctuate." *See* The American Heritage Dictionary of the English Language 677 (4th ed.2006) (defining fluctuate as "[t]o rise and fall or vary irregularly"). In addition, § 39–26.1–1 established a goal of stabilizing *long-term* prices, not stabilizing prices as soon as the new renewable energy sources are accessed.

Lastly, the General Assembly was well aware that this annual 3.5 percent rate increase was included in the 2009 PPA. If the General Assembly wanted the 2010 PPA to contain different provisions in or-

der to freeze pricing permanently, as petitioners suggest, this requirement is not evident anywhere in the statute. Accordingly, without locating any such intent expressed by the Legislature, we decline to read in a prohibition against the 2010 PPA's 3.5 percent scheduled price escalations. *See New England Die Co. v. General Products Co.,* 92 R.I. 292, 298, 168 A.2d 150, 154 (1961) ("[I]t is not within the province of this [C]ourt to insert in a statute words or language that does not appear therein except in those cases where it is plainly evident from the statute itself that the [L]egislature intended that the statute contain such provisions.").

## B

### Challenges to the Four–Factor Test

Continuing beyond petitioners' ancillary arguments, we next tackle their challenges to the majority's determination that the 2010 PPA achieved all four criteria in § 39–26.1–7(c)'s four-factor test. Section 39–26.1–7(c) directs the commission to approve the 2010 PPA if: (1) the 2010 PPA is commercially reasonable; (2) the 2010 PPA provides for a provision to decrease pricing based on § 39–26.1–7(e); (3) the 2010 PPA is likely to provide economic benefits; and (4) the 2010 PPA is likely to provide environmental benefits.

### 1

### Commercially Reasonable

Factor one, presented in § 39–26.1–7(c)(i), requires the commission to evaluate whether the 2010 PPA "contains terms and conditions that are commercially reasonable." Under the prior 2009 LTC statute, "commercially reasonable" meant "terms and pricing that are reasonably consistent with what an experienced power market analyst would expect to see in transactions involving newly developed renewable ener-

gy resources." Section 39–26.1–2(1). Applying this previous statutory definition, the commission unanimously determined that the 2009 PPA was not "commercially reasonable" and therefore denied approval of the 2009 PPA in docket 4111. In making the requisite comparison between the 2009 PPA and other renewable energy transactions, the commission compared the 2009 PPA's "terms and pricing" with any renewable energy project, "regardless of sizing restrictions, technology, location, or novelty." Using this protocol and "[b]ased on the evidence, the [c]ommission f[ound] that the pricing of 24.4 cents per kWh with a 3.5% annual escalator * * * [wa]s higher than that which an experienced power market analyst would expect to see in transactions involving newly developed renewable energy resources" and concluded that the 2009 PPA was not commercially reasonable.

In docket 4185, after the General Assembly revised the LTC statute, the applicable definition of "commercially reasonable" now was deemed "terms and pricing that are reasonably consistent with what an experienced power market analyst would expect to see for a project of a *similar* size, technology and location, and meeting the policy goals in subsection (a) of this section." Section 39–26.1–7(c) (emphasis added). Based on this amended definition, the commission was constrained to compare the 2010 PPA's terms and pricing only to projects that were similar in scale to the wind farm proposed for Block Island or "adjust[ed] for size, location and technology." Using this legislatively altered methodology, the 2010 PPA's "IRR terms [now] were within the zone of reasonableness." "[T]he [c]ommission['s majority] [could] not conclude that the terms and conditions of the [2010] PPA in their entirely [sic] should be deemed commercially unreasonable."

i

### Omission of Transmission–Cable Costs

■ In pressing their argument that the commission should have found that the 2010 PPA is commercially unreasonable, petitioners contend that the agreement improperly omitted the costs and pricing for the transmission cable between the mainland and Block Island. They point to the commission's notation that if the transmission-cable costs were included in the 2010 PPA, "the installed cost of the project [would have increased] to 23% above the highest cost of the comparable[ ] [projects]," which would have made the 2010 PPA commercially unreasonable. However, as explained above, the revised LTC statute does not require that National Grid and Deepwater Wind include provisions for transmission-cable construction and its associated costs in the 2010 PPA itself. Nonetheless, petitioners argue that § 39–26.1–7(c)'s definition of commercially reasonable requires the 2010 PPA to "meet[ ] the policy goals in [§ 39–26.1–7(a) ]" and that § 39–26.1–7(a) requires the transmission cable in the 2010 PPA. Again, our examination of § 39–26.1–7(a) does not reveal any mandate that the 2010 PPA must provide for construction of the transmission cable or must allocate the costs for the construction of the transmission cable. This subsection simply lists "provid[ing] the Town of New Shoreham with an electrical connection to the mainland" as a goal that the Town of New Shoreham Project is to "effectuate." Section 39–26.1–7(a). Although the 2010 PPA and the transmission arrangements are integral parts of the Town of New Shoreham Project, § 39–26.1–7(a) does not require the 2010 PPA alone to "effectuate" this transmission-cable goal. Accordingly, although we agree that the Town of New Shoreham Project, on the whole, must include the transmission cable, the revised LTC statute does

not require that the 2010 PPA must include transmission-cable provisions in its own right. As such, the commission's determination of commercial reasonableness for the 2010 PPA did not have to anticipate or consider transmission-cable costs flowing out of a future agreement.

## ii

### Above–Market Pricing

The petitioners next argue that "the evidence established a commercially unreasonable pricing." However, petitioners focus on the increased burden on electricity ratepayers and how much more they will have to pay for electricity if the 2010 PPA actually comes to fruition. This assessment of an increased burden, while accurate, does not apply the statutory definition of commercially reasonable, which looks only at a comparison of terms and pricing between the 2010 PPA and other renewable energy projects that are similar to the instant wind farm. Section 39–26.1–7(c). The definition of commercially reasonable, applied properly by the majority, does not concern itself with the terms and pricing for fossil-fuel-generated electricity projects in the wholesale market. Thus, we deem petitioners' argument unpersuasive.

## iii

### Focus on Costs

The petitioners' final contention with respect to commercial reasonableness avers that the commission incorrectly focused on costs, rather than the pricing of the 2010 PPA. For example, they maintain that a

comparison of pricing shows that the 2010 PPA pricing is 30 percent higher than the Cape Wind[36] PPA pricing. However, as National Grid notes in its brief to this Court, the commission relied on a Deepwater Wind witness, David P. Nickerson (Mr. Nickerson),[37] who specifically testified that the 2010 PPA's "*pricing and the associated payment stream over time is commercially reasonable.*" (Emphasis added.) The commission expressly credited and relied on Mr. Nickerson's testimony (and that of others including James Stahle[38] and Mr. Parker) to make their finding that the 2010 PPA's pricing was commercially reasonable when compared to other projects *adjusted* for "size, location, and technology." Typically, this Court does not question fact finding by the commission. *Pine,* 659 A.2d at 676 ("The factual determinations of the commission are conclusive upon this [C]ourt and are generally unassailable if supported by legal evidence."). Moreover, if the commission determined that these witnesses' comparative and mathematical assessments for pricing were credible, without noting utter incorrectness in their reasoning, we are not in a position to disagree. *Newport Electric Corp.,* 650 A.2d at 492 (reiterating that credibility determinations are for the commission and not for this Court). This Court holds that the majority's finding concerning the 2010 PPA's commercial reasonableness was not in error.

## 2

### Price–Savings Provision

Provided in § 39–26.1–7(c)(ii), the second factor requires the commission to veri-

36. In its decision, the commission described that Cape Wind is a "domestic offshore wind project[ ]" in Massachusetts that, among other differences, "is larger than the proposed [p]roject."

37. According to the commission's decision, David P. Nickerson is the "Managing Member

of Mystic River Energy Group, LLC, a consulting firm."

38. According to docket 4185, James Stahle is the "founding partner and Managing Director of CP Global Partners, LLC * * * a financial advisory and merchant banking firm, and the majority owner of CP Energy Group, LLC."

fy that the 2010 PPA "contains provisions that provide for a decrease in pricing if savings can be achieved in the actual cost of the project pursuant to subsection 39–26.1–7(e)." The petitioners raise two challenges to the majority's assessment that the 2010 PPA met this factor: (1) the 2010 PPA's price-savings provision did not use a proper "base amount," and (2) the cost-verification process implemented by the 2010 PPA did not incorporate a reasonableness check on the incurred construction costs.

### i

### Base Amount

In § 39–26.1–7(e), the revised LTC statute details the newly required price-savings provision. The 2010 PPA, "subject to subsection 39–26.1–7(a)[,] shall provide for terms that shall decrease the pricing if savings can be achieved in the actual cost of the project." Section 39–26.1–7(e)(i). The statute directs that "all realized savings [would be] allocated to the benefit of the ratepayers." *Id.* Aligning with § 39–26.1–7(a),[39] § 39–26.1–7(e)(ii) establishes that the "initial fixed price" from the 2009 PPA was the "maximum initial price" for the 2010 PPA. "[A]ny realized savings" between the estimated cost of construction and the actual cost of construction were to "reduce such [initial] price." Section 39–26.1–7(e)(ii). "After making any such reduction * * *, the price for each year" would be "fixed" by the 2010 PPA. *Id.* Section 39–26.1–7(e)(iii) provides the mechanism for determining whether construction savings were realized. "[A]t the com-

pletion of the construction of the project," the developer would certify the "costs of the project." Section 39–26.1–7(e)(iii). "An independent third-party," acceptable to the division, then would "verify the accuracy of" these certified costs. *Id.* Once verified, the division would communicate the "final costs" to National Grid. *Id.* Thereafter, the commission would "reduce the expense to ratepayers consistent with a verified reduction in the project costs." *Id.*

The parties generally agree that National Grid properly incorporated a price-savings provision into the 2010 PPA that would take effect at the completion of the project. Once the "final costs," or verified costs, of construction are concretely known, a provision in the 2010 PPA reduces, if savings were incurred,[40] the bundled price that National Grid must remit to Deepwater Wind. The revised LTC statute picks up the next step with respect to the ratepayers: the commission reviews whether the rate schedule would result in overpayment from the ratepayers to National Grid and, if so, the initial rate of 24.4 cents/kWh would be reduced. Section 39–26.1–7(e)(iii). On appeal, the crux of petitioners' argument is that the 2010 PPA unfairly kept the pricing the same as it was in docket 4111 (24.4 cents/kWh) while reducing the base amount for construction to $205 million. The petitioners argue that if pricing stayed at docket 4111's 24.4 cents/kWh, then the base amount for construction of $219 million, which was discussed during docket 4111 as undergirding the 2009 PPA's price and was also testified

---

**39.** Section 39–26.1–7(a) states that "[a]ny amendments [contained in the 2010 PPA] shall ensure that the pricing can only be lower, and never exceed, the original pricing included in the power purchase agreement that was reviewed in docket 4111." This section also presumes that "the pricing terms of such [2010 PPA] are amended as more fully

described in subsection 39–26.1–7(e)." Section 39–26.1–7(a).

**40.** Savings refers to a positive difference between the estimated base amount for construction ($205 million) and the actual total costs (yet to be determined).

to at legislative hearings prior to the adoption of the revised LTC statute, should have remained the same, too. The petitioners maintain that when the 2010 PPA's price-savings provision is invoked at the completion of construction, using the $205 million base amount will allow the first $14 million in savings to go to National Grid and Deepwater Wind instead of to the ratepayers. This result, they claim, contravenes § 39–26.1–7(c)(ii) and (e). The petitioners implore this Court to hold that the commission improperly permitted the 2010 PPA to use the $205 million base amount, instead of the $219 million base amount.

When faced with this exact question in docket 4185, the commission's majority determined that the General Assembly did not intend National Grid and Deepwater Wind to be "locked in" to their $219 million construction-cost estimate from docket 4111. The majority based its interpretation on the Legislature's specific direction that "maximum initial *price*" for the 2010 PPA could not exceed docket 4111, but never required the parties to carry over "*costs*" from docket 4111. Therefore, the majority concluded that the General Assembly must have expected that the base cost could change without a corresponding change in initial price. Furthermore, the commission recognized that this $219 million cost figure likely could not provide the necessary returns to make the wind farm financeable. Given the Legislature's express desire to see this wind farm built and the impossibility of that result with costs locked at $219 million, the commis-

sion determined that the General Assembly implicitly permitted the parties in their 2010 PPA to adjust the cost estimate for the project while leaving pricing at its maximum. The majority also found "significan[t]" that a National Grid witness, Madison N. Milhous,[41] had testified that the $205 million costs ($203.9 million to be exact), and not the $219 million costs, actually was the amount that the pricing in the 2009 PPA was based upon. By crediting this witness and his certainty that $205 million was the basis for the 2009 PPA's pricing, the majority discounted data-request[42] responses from Deepwater Wind in docket 4111 and docket 4185 that "[*$219 million*] was Deepwater Wind's estimate and basis for the fixed price proposal in the [d]ocket 4111 PPA." (Emphasis added.) Accordingly, given National Grid's testimony that, the carried-over pricing from the 2009 PPA actually was based on $205 million, not $219 million, the majority found it perfectly acceptable for the 2010 PPA to use the same pricing (24.4 cents/kWh) and base cost estimate ($205 million) from the 2009 PPA.

Before this Court, petitioners again argue that because "the Legislature specifically referred to [docket 4111] at least *five* times in subsections (a), (b), and (e) of the [revised statute]," these references indicate that the General Assembly expected that docket 4111's $219 million estimated cost would be carried over from docket 4111 to serve as the 2010 PPA's base amount. The majority did not agree with this assumption, and neither do we. Section 39–26.1–7(a) states that "[a]ny amend-

---

41. According to the commission's decision, Madison N. Milhous is the "Director of Wholesale Market Relations for the Energy Portfolio Management organization at [National] Grid."

42. "In any proceeding pending before the Commission, the Commission, staff and any

party may request such data, studies, workpapers, reports, and information as are reasonably relevant to the proceeding and are permitted by these rules or by statute." Public Utilities Commission, Rules of Practice and Procedure at 21 (May 1, 1998).

ments [to the 2010 PPA] shall ensure that the pricing can only be lower, and never exceed, the original pricing included in the power purchase agreement that was reviewed in docket 4111." Additionally, § 39–26.1–7(e)(ii) reiterates that the "maximum initial price" for the 2010 PPA is the "initial fixed price" from the 2009 PPA in docket 4111. Section 39–26.1–7(e)(ii) then states that the 2010 PPA will make "any such reduction to the initial price based on realized savings" and after making that reduction, the 2010 PPA shall fix the price for each year. These sections require the 2010 PPA to have a mechanism in place that will recalculate and then fix its initial price, which cannot exceed the 24.4 cents/ kWh "original pricing" from docket 4111. Section 39–26.1–7(a). We locate no language in these sections that requires the 2010 PPA to import the estimated *costs* discussed in docket 4111. Certainly, the General Assembly was clear that it did not want pricing in the 2010 PPA to exceed pricing from the 2009 PPA and, as all parties confirm, the 2010 PPA does not violate this rule. Its initial pricing, 24.4 cents/kWh, is identical to the 2009 PPA and docket 4111. Furthermore, our resolution of any ambiguities concerning the General Assembly's intentions for the 2010 PPA's base cost must pay homage to the majority's interpretation. *Pascoag Apartment Associates, LLC*, 950 A.2d at 445. Because the majority also concluded that the General Assembly, if it had actually desired to, "could easily have tied the 'costs' to [d]ocket 4111 as well as the price," our holding that the costs from docket 4111 need not be a fixture in the 2010 PPA is additionally buttressed.

■ In support of their challenge to the $205 million base amount, petitioners provide this Court with numerous citations to Deepwater Wind, National Grid, and division witnesses who testified that the 2009 PPA's pricing really was based on $219 million in costs. Their argument unfolds as follows: if cost correlates to price, then how can a $219 million cost result in a 24.4 cents/kWh price and the lesser $205 million cost result in that same 24.4 cents/ kWh price? Although this Court understands petitioners' bewilderment and duly notes their references to the record, this argument is in vain, given the majority's overt credibility determination. The commission also recounted the testimony questioning the 2010 PPA's $205 million base amount, but the majority ultimately chose to believe the National Grid witness, Mr. Milhous, who testified "of significance" that "$203.9 million, albeit slightly lower than the latest $205 [million] projection, was the cost figure upon which [National] Grid relied in negotiating the 2009 PPA." In effect, the majority accepted that $205 million, *not* $219 million, was the cost that the *2009 PPA's* price was based upon. Therefore, we must decline to accept petitioners' implicit invitation to "consider *de novo* the evidence presented before the commission and render a different decision." *South County Gas Co. v. Burke*, 551 A.2d 22, 24 (R.I.1988) (holding, in the face of "the company['s] argu[ment] that the commission 'chose to ignore' [another witness's] testimony * * *, [that] the decision and order reveal[ed] that his testimony was considered and, for reasons clearly enunciated in its report, rejected"). Although an outsider perspective might reflect upon the majority's determination with some skepticism given the repeated testimony supporting the proposition that the 2009 PPA's price was based on $219 million, not $205 million, we are constrained from second-guessing decisions made in the credibility arena. *See Newport Electric Corp.*, 650 A.2d at 492. Accordingly, in view of the just-referenced credibility assessments, it was permissible for the 2010 PPA to use the $205 million

base-amount cost and the 24.4 cents/kWh price. The majority did not err when it assessed that these 2010 PPA's provisions comply with the second factor of § 39–26.1–7(c)(ii) and § 39–26.1–7(e).

### ii

### Cost–Verification Process

The petitioners also quarrel with the 2010 PPA's compliance with § 39–26.1–7(e)'s cost-verification provisions. They argue that rather than just confirming what Deepwater Wind spent, the independent party, approved by the division, is statutorily required to assess whether the expenditure was "reasonable," *i.e.,* whether Deepwater Wind overpaid for any construction materials, labor, or other costs. The petitioners argue that because the 2010 PPA permits the verification process to dispute a cost only if (1) Deepwater Wind did not incur the cost, (2) the cost was not supported by documentation, or (3) the cost was plagued by arithmetical or summation errors, it violates the "verification requirement" by not requiring an examination that "a single dollar of the hundreds of millions of dollars * * * [was] reasonably or prudently spent."

 This Court notes that petitioners' petition for a writ of certiorari raised their concerns with § 39–26.1–7(e)'s price-savings provision and the proper "base amount" for the 2010 PPA, but fails to locate petitioners' specific challenge to § 39–26.1–7(e)(iii)'s cost-verification process therein. Accordingly, "as we have previously held, we will not consider any issue that is not included in a petitioner's initial petition for issuance of a writ of certiorari." *Rhode Island State Labor Relations Board,* 921 A.2d at 119; *see also* § 39–5–1. However, even if this issue was properly before us, we would not ascribe to petitioners' contentions that the cost-verification process in the 2010 PPA is

fatally flawed. Section 39–26.1–7(e)(iii) simply requests the independent third-party to "verify the accuracy of such costs at the completion of the construction of the project" and then states that "[t]he reasonable costs of this verification, shall be paid for by the developer." The statute does not require the independent third party to actually verify the "reasonableness" of the costs, only that he or she verify the "accuracy" of the costs. Moreover, § 39–26.1–7(e)(iii) directs the developer to pay for the "reasonable costs of this verification," which to us is an instruction for the developer to pay the independent third party for *conducting* the verification. This statutory phrase does not, as petitioners suggest, add any additional "reasonableness" criterion to the independent third-party's review. Accordingly, if we considered this improperly preserved claim, we would not be persuaded by petitioners' argument.

### 3

### Likely Economic–Development Benefits

The third factor, § 39–26.1–7(c)(iii), requires the commission to examine whether the 2010 PPA "is *likely to provide* economic development benefits, including: facilitating new and existing business expansion and the creation of new renewable energy jobs; the further development of Quonset Business Park; and, increasing the training and preparedness of the Rhode Island workforce to support renewable energy projects." (Emphasis added.) To assist the commission in making its finding on economic-development benefits, the General Assembly directed that an EDC expert, retained at the expense of Deepwater Wind pursuant to § 39–26.1–7(b), would provide an "advisory opinion on the findings of economic benefit." Section 39–26.1–7(c). The commission was required to give this advisory opinion "substantial

deference" when making its own findings on the issue of "economic development benefits." *Id.* A majority of the commission responded that the 2010 PPA met this criterion of the four-factor test.

On appeal, petitioners contend that "the [2010] PPA will not provide economic development benefits, but will instead be a detriment to facilitating new and existing business expansion in Rhode Island." To attack the majority's finding that the 2010 PPA was likely to provide economic-development benefits, petitioners lodge complaints against the EDC advisory opinion's credibility and its worthiness of substantial deference and respondents' cooled heels on presenting evidence related to this factor. Most predominantly, however, petitioners insist that a net-benefit test, akin to Commissioner Bray's interpretation, should have been applied in a manner that concluded that the net was not in the 2010 PPA's favor.

i

### EDC's Opinion Based on Credible Evidence and Entitled to "Substantial Deference"

The petitioners challenge the credibility of EDC's advisory opinion and whether it presented facts or simply speculation. They direct this Court to the testimony of Edward M. Mazze, Ph.D.[43] (Dr. Mazze) to argue the opposing view—that the 2010 PPA will be an economic-development detriment, not benefit, that the IMPLAN model (used to calculate the economic benefits) has "weaknesses," and that unverified data was provided to EDC. However, this contrary evidence was duly noted by the commission, and a majority of the panel chose to credit the EDC expert's opinion of the economic landscape based on the

IMPLAN model. Although petitioners imply that the commission ignored Dr. Mazze's testimony, we observe that its decision contains a thorough recitation of the various arguments that detract from the EDC advisory opinion, but ultimately credited the findings presented by EDC. *South County Gas Co.*, 551 A.2d at 24 (holding that this Court will not "consider *de novo* the evidence presented before the commission and render a different decision") (emphasis added).

■ Relatedly, petitioners also argue that the EDC's expert opinion should not have been admitted into evidence at all because the scientific methodology underpinning the IMPLAN model allegedly could not survive the test articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), for admitting expert testimony. *See Narragansett Electric Co. v. Carbone*, 898 A.2d 87, 96, 96 n. 6 (R.I.2006) (explaining that "[a] party makes a proper motion for [a *Daubert*] hearing only when he or she sufficiently alerts the trial justice of the scientific issue at stake by presenting an affidavit or offer of proof to substantiate his or her claim that the opposing party's proposed expert testimony is scientifically invalid") (citing *Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786). Concerning this contention, we note that the Legislature specifically articulated that "the commission shall not be bound by technical rules of evidence." Section 39–1–11. Furthermore, the alleged shortcomings of the IMPLAN model were well explored by other financial-analyst witnesses and these witnesses' criticisms were identified and considered by the commission in its decision. In the face

---

**43.** According to the commission's decision, Edward M. Mazze, Ph.D. is a "Distinguished University Professor of Business Administration at the University of Rhode Island and current member of the Ocean State Business Development Authority."

of the contrary testimony, Commissioner Germani declared that IMPLAN is the "generally accepted input-output model used to measure the benefits of certain cost expenditures," and Commissioner Roberti implicitly agreed to the same. Again, because this Court is constrained from disturbing the majority's fact-finding or rejecting its reasoned credibility determinations, we decline to dislodge its reliance on the IMPLAN model and the EDC advisory opinion. *See South County Gas Co.*, 551 A.2d at 24; *see also Newport Electric Corp.*, 650 A.2d at 492. Lastly, because petitioners do not dispute that Rhode Island will enjoy some economic-development benefits, we are further convinced that this *Daubert* argument should not detain us. The real issue is whether the commission should have used the net-benefit test and, if so, whether the benefits here were outweighed by the costs.

ii

### Lack of Respondent–Presented Evidence Supporting Economic–Development Benefits

In an attempt to further undermine the economic-development-benefits finding by the majority, petitioners take aim at National Grid and Deepwater Wind for "fail[ing] to satisfy their burden of proof on the statutory economic development tests." They deem it "astonishing that [these parties] chose not to put on *any*

*evidence at all* regarding compliance with the detailed economic development requirements of * * * § 39–26.1–7(c)(iii)." Although petitioners correctly recall that National Grid and Deepwater Wind did not proffer evidence concerning economic-development benefits, we observe nothing in the revised LTC statute requiring either National Grid or Deepwater Wind to do so. By allotting "substantial deference" to EDC's advisory opinion, the General Assembly necessarily indicated that these experts were best equipped to analyze the economic-development-benefits considerations. Section 39–26.1–7(c). It was within National Grid's and Deepwater Wind's strategic purview to rely on this delegation of responsibility to the EDC [44] rather than adding their own evidence into the mix.

iii

### Net–Economic–Benefit Test

■ At the outset, this Court dismisses any suggestion by petitioners that because two of the three commissioners applied a net-benefit test,[45] this statutory interpretation of § 39–26.1–7(c)(iii) becomes sacrosanct as the "law of the case." We ardently disagree. Law of the case is a discretionary doctrine that prefers consistent rulings on the same issues when they occur at the *same* judicial level, not when the issues are propounded to a reviewing court. *See Taveira v. Solomon*, 528 A.2d 1105, 1107 (R.I.1987)

**44.** Concerning petitioners' suggestion of "bias and conflict of interest" infecting the EDC's 2010–PPA–favorable advisory opinion because Deepwater Wind paid for the EDC expert, we find this contention to be wholly without merit. Based on § 39–26.1–7(b), the EDC was directed to select the expert and Deepwater Wind was required *by statute* to pay for this expert's analysis. That Deepwater Wind followed this statutory instruction cannot be held against it.

**45.** We further note that docket 4185 did not present a unified application of the net-benefit test to which we could even subscribe. Rather it presents a unique scenario in which there are three commissioners and three variations of the use or nonuse of the net-benefit test: Commissioner Germani declined to use the test and approved the 2010 PPA; Commissioner Roberti opted to apply the test and also approved the 2010 PPA; and finally Commissioner Bray also opted to apply the test, but disapproved of the 2010 PPA.

("The law of the case doctrine 'states that ordinarily, after a judge has decided an interlocutory matter in a pending suit, a second judge, confronted at a later stage of the suit with the same question in the identical manner, should refrain from disturbing the first ruling.'") (quoting *Salvadore v. Major Electric & Supply, Inc.,* 469 A.2d 353, 355–56 (R.I.1983))). In the instant matter, by putting their arguments concerning economic-development benefits before this Court, petitioners necessarily have opened the door for a legal evaluation of the application the net-benefit test.[46]

The EDC found that the 2010 PPA would provide economic benefits of $129 million, and Deepwater Wind represented that the 2010 PPA would supply six permanent jobs. The majority determined that the 2010 PPA satisfied § 39–26.1–7(c)(iii)'s factor by likely providing "economic development benefits," albeit using different analysis methods. Chairman Germani assessed that a net-benefit test was not required by the plain language of the statute, so he applied the statute literally, examining only whether there were economic benefits and not offsetting those benefits by costs. In consideration of the EDC's opinion that benefits likely would be provided, he confirmed that the 2010 PPA met the "economic development benefits" requirement. Commissioner Roberti opted to apply a net-benefit test. However, he concluded in accordance with the EDC's opinion that the 2010 PPA likely would provide economic-development benefits and that any harm to Rhode Island businesses, like petitioners, was not suffi-

ciently quantifiable to overshadow these "projected economic benefits." Commissioner Bray also opted to use a net-benefit test, but unlike Commissioner Roberti, she determined that the $129 million in benefits would not offset the above-market power costs of $370 million. Because the 2010 PPA would cause a net loss for the economy, and because the 2010 PPA would not facilitate new and existing business expansion, Commissioner Bray found that the 2010 PPA was not likely to provide economic-development benefits.

On appeal, to refute the majority's finding that the 2010 PPA was "likely to provide economic development benefits," petitioners argue that the entire commission should have used a net-benefit test that weighed costs or detriments caused by the 2010 PPA against the likely gains. The petitioners implore this Court to adopt Commissioner Bray's reasoning.

Given the fractured majority opinion, we acknowledge that there is ambiguity as to whether the revised LTC statute, in a matter of first impression, expected the commission to apply a net-benefit test in § 39–26.1–7(c)(iii) to assess "economic development benefits." However, because there are three commissioners and three different versions of the application or non-application of the net-benefit test, here, there is no consensus within the ranks of the agency to which we could grant deference. *See Local 777, Democratic Union Organizing Committee, Seafarers International Union of North America, AFL–CIO v. National Labor Relations Board,* 603 F.2d 862, 869, 881 n. 51

---

**46.** We find meritless petitioners' allegation that respondents have waived any argument against the net-benefit test. Obviously respondents could not raise a separate challenge to the test's application by the single commissioner in the majority or the dissenting commissioner because they *prevailed* in

docket 4185. *See* § 39–5–1 ("Any person aggrieved by a decision or order of the commission may * * * petition the [S]upreme [C]ourt for a writ of certiorari to review the legality and reasonableness of the decision or order.").

(D.C.Cir.1979) (explaining that "decisional inconsistency * * * was the basis for [the court's] reluctance to show any particular deference to the [b]oard's decision in this case"). As such, our analysis turns on other canons of statutory interpretation.

■ We start with the statute in question, § 39–26.1–7(c)(iii), which is completely silent with respect to the application of a net-benefit test. The statute directs the commission to examine whether the 2010 PPA is likely to provide "economic development benefits" and then lists several types of benefits that would qualify—for example, "the further development of Quonset Business Park." Section 39–26.1–7(c)(iii). As noted by Chairman Germani, the General Assembly knew how to require a *net*-benefit test when it wanted the commission to use that type of analysis. *See* § 39–26.1–8(b)(i) (directing the commission to review the "utility-scale offshore wind project" considering "[t]he economic impact and potential risks, if any, of the proposal on rates to be charged"). Because the Legislature did not request an "economic *impact*" analysis of the 2010 PPA and simply asked the commission to review the "economic developments *benefits*" of the 2010 PPA, it is this Court's view that Chairman Germani's analysis was correct and that the commission should have limited its review to the positive side of the economic ledger. *See Kucana v. Holder,* — U.S. —, 130 S.Ct. 827, 838, 175 L.Ed.2d 694 (2010) ("[W]here [the Legislature] includes particular language in one section of a statute but omits it in another section of the same [a]ct, it is generally presumed that [the Legislature] acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting *Nken v. Holder,* — U.S. —, 129 S.Ct. 1749, 1759, 173 L.Ed.2d 550 (2009)); *Simeone v. Charron,* 762 A.2d 442, 448 (R.I. 2000) ("This Court * * * is not 'entitled to

write into the statute certain provisions of policy which the [L]egislature might have provided but has seen fit to omit * * *. * * * If a change in that respect is desirable, it is for the [L]egislature and not for the [C]ourt.' ") (quoting *Elder v. Elder,* 84 R.I. 13, 22, 120 A.2d 815, 820 (1956)).

To argue for the application of a net-benefit test, petitioners laud Commissioner Bray's analysis and urge that we embrace it. She stressed that the General Assembly could not have intended the "absurd result" of permitting any economic benefit to satisfy the third factor "even [if] the potential economic harm would outweigh it." She continued that the General Assembly did not have to expressly direct the commission to use a net-benefit test because the General Assembly assumed that the commission would use the net test as it did in docket 4111. However, her reasoning has two flaws. First, docket 4111 did not apply a formal net-benefit test; rather, after considering some of the drawbacks of higher electricity prices, the commission noted that "[a]dmittedly, [it] is not an economic development agency but this approach [in the 2009 PPA], on its face, does not appear to represent cost effective economic development." Second, although Commissioner Bray purports that in docket 4111, the commission "used a net economic benefits test based on § 39–26.1–5(e)," the revised LTC statute explicitly omits § 39–26.1–5(e) from application to the 2010 PPA. Section 39–26.1–7(d) ("Any review of the commission's decision shall be according to chapter 5 of title 39 * * *. The provisions of * * * subsections (b), (c), (d), and (f) of § 39–26.1–5 shall apply * * *."). Accordingly, by not specifically directing the commission to use a net-benefit test when addressing factor (iii) in § 39–26.1–7(c) and by specifically omitting application of a section that the commission allegedly had previously interpreted as requiring a net-benefit test, we are of

the opinion that the General Assembly did not intend that the commission weigh economic costs and gains when reviewing the 2010 PPA. It simply required the commission to look at the positive side of the economic ledger. Although this Court recognizes the parade of irrational possibilities that could incur from this legislative direction, any other interpretation by this Court would impermissibly read purposefully unwritten words into the statute's meaning and subvert the Legislature's clear intention to see the 2010 PPA reach fruition. *See Carlson v. McLyman,* 77 R.I. 177, 180, 74 A.2d 853, 855 (1950) ("It is not within the province of this [C]ourt to insert or delete words from a statute unless the necessity to do so is plainly evident in order to carry out the legislative intent.").

As such, because the commission was not required to use a net-benefit test and because the commission properly afforded substantial deference to the EDC advisory opinion, which assessed economic benefits of $129 million, we agree that the commission did not err in finding that the 2010 PPA met the requirements of § 39–26.1–7(c)(iii).

**4**

**Likely Environmental Benefits**

Section 39–26.1–7(c)(iv) requires the commission to examine whether the 2010 PPA *"is likely to provide* environmental benefits, including the reduction of carbon emissions." (Emphasis added.)

The commission, with "substantial deference" given to DEM's advisory opinion, *unanimously* concluded that the 2010 PPA met the environmental-benefits factor because "there is the likelihood that the Deepwater demonstration project will enhance the environmental quality of the Town of New Shoreham because there will be * * * a reduction in carbon emissions

resulting from Block Island Power Company's ability to purchase power from mainland power suppliers, thus eliminating its reliance on diesel generators except in isolated instances of a cable outage. The transmission cable is part of the proposed Project and is mandated by * * * § 39–26.1–7." The petitioners argue that the commission's finding of environmental benefits relies completely on the assumption that a transmission cable between Block Island and the mainland will be built. Because the 2010 PPA does not include provisions for installing the transmission cable, petitioners maintain that there cannot be any likely environmental benefits emanating from the 2010 PPA.

However, the environmental-benefits factor simply requires a finding that the 2010 PPA *"is likely to provide"* environmental benefits, not that the 2010 PPA *must* provide *direct* environmental benefits. Section 39–26.1–7(c)(iv) (emphasis added). The commission aptly noted that the transmission cable is part of the Town of New Shoreham Project, of which the 2010 PPA is an integral part. By commencing the 2010 PPA, the transmission-cable phase of the Town of New Shoreham Project is closer to realization. The approval of the 2010 PPA creates the *likelihood* that the environmental benefits that DEM attributed to the cable will be fulfilled. As such, the commission did not err in finding that the 2010 PPA satisfied § 39–26.1–7(c)'s fourth factor.

**IV**

**Conclusion**

Although we view with trepidation the General Assembly's unwavering quest to sink this demonstration wind farm into the sediment of Rhode Island's continental shelf, we nonetheless are constrained by our standard of review and the bounds of

the revised LTC statute. "To do otherwise, even if based on sound policy and the best of intentions, would be to substitute our will for that of a body democratically elected by the citizens of this state and to overplay our proper role in the theater of Rhode Island government." *DeSantis v. Prelle*, 891 A.2d 873, 881 (R.I.2006). In consideration of the foregoing, we are of the opinion that the commission's majority accurately interpreted the law and properly applied the law by making findings that are "lawful and reasonable, fairly and substantially supported by legal evidence, and sufficiently specific * * * enabl[ing] us to ascertain [that] the evidence upon which the commission based its findings reasonably support[ed] the result." *Providence Water Supply Board v. Public Utilities Commission*, 708 A.2d 537, 541 (R.I.1998) (quoting *Roberts v. New England Telephone and Telegraph Co.*, 487 A.2d 136, 138 (R.I.1985)). Accordingly, the commission's decision approving the 2010 PPA in docket 4185 is affirmed, and the writ of certiorari heretofore issued is quashed. The record shall be remanded to the commission with our decision endorsed upon it. In so deciding, it is this Court's fervent hope that our Legislature's William Seward-esque policy decision championing this amended purchase-power agreement proves as lucrative and majestic as the Alaska Purchase of 1867.[47]

47. "Skeptics had dubbed the purchase of Alaska 'Seward's Folly,' but the former Secretary of State[, William Seward,] was vindicated when a major gold deposit was discovered in the Yukon in 1896, and Alaska became the gateway to the Klondike gold fields. [Additionally,] [t]he strategic importance of Alaska was finally recognized in World War II." United States Department of State: Office of the Historian, Purchase of Alaska, 1867, *available at* http://history.state.gov/milestones/1866–1898/AlaskaPurchase.